# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| MICHAEL DEAN OVERSTREET, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:08-CV-226 PS |
| | ) | |
| SUPERINTENDENT, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Around midnight on September 26, 1997, Michael Dean Overstreet abducted, confined, raped, and murdered 18-year-old Kelly Eckart as she was coming home from work. Overstreet was 30 years old, married with four children, and was out drinking that night. He had a history of mental illness. Overstreet was charged with capital murder, and the case against him was very strong. His DNA was found on Eckart, and there was an abundance of other evidence. Overstreet claims to have no memory of the night. The sentencing judge acknowledged that Overstreet suffered from an extreme mental disorder which she found substantially impaired his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Nevertheless, she found that the aggravating circumstances outweighed the mitigating circumstances and sentenced him to death.

In the present petition for a writ of habeas corpus, Overstreet raises eleven grounds for relief, many of which have several subparts. But after thoroughly reviewing the state court record, I can find no basis upon which to grant relief. Therefore, the habeas corpus petition will be denied.

# **BACKGROUND**

This case has been reviewed twice by the Indiana Supreme Court: first on direct appeal,

*Overstreet v. State*, 783 N.E.2d 1140 (Ind. 2003) (which I'll refer to as *Overstreet I*); then on

appeal from the denial of post-conviction relief, *Overstreet v. State*, 877 N.E.2d 144 (Ind. 2007)

(*Overstreet II*). In a habeas corpus proceeding, "a determination of a factual issue made by a

State court shall be presumed to be correct" unless the petitioner is able to rebut that

presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The facts as detailed

below come from the Indiana Supreme Court opinions in *Overstreet I* and *Overstreet II*.

On September 26, 1997 at 10:00 pm, Kelly Eckart got off work from her job at Walmart.

Her boyfriend Anthony Evans met her at the store as she ended her shift and they shopped for

about an hour and then got into their respective cars and headed home. About two hours later

Eckart's car was found abandoned by the side of the road, with its lights on, keys in the ignition

and her purse on the front seat. Three days later, her partially clothed body was discovered in a

remote area of a neighboring county; she had been shot in the head, raped and strangled to death

with a strap from her bib overalls and a shoestring from one of her shoes.

A little more than a month went by and the homicide remained unsolved until Scott

Overstreet entered the picture. The police received a tip that Scott Overstreet might have some

information about the murder of Kelly Eckart. (From here on out I'll refer to Scott Overstreet as

"Scott" to avoid confusing him with his brother, Petitioner Michael Overstreet).

Police interviewed Scott, and here's what he told them (and what he later testified to at

trial): in the early morning hours of September 27, 1997, Scott received a call from his brother.

Overstreet asked Scott to meet him at a local motel. Overstreet wasn't specific about what he

2

wanted but it was clear to Scott that he needed his help. So Scott drove to the motel and met his brother in the parking lot. Overstreet informed Scott that his "girlfriend" was in his van, that they had been drinking and needed a ride. From his peripheral vision Scott said he could see something white in the back of Overstreet's van. Scott left his car in the motel parking lot, got into his brother's van and started driving Overstreet and his "girlfriend" to their destination. But about fifteen minutes into the ride, Overstreet told Scott that he had changed his mind and now wanted to go to Camp Atterbury, which is a park in a neighboring county. When questioned why he wanted to go to Camp Atterbury, Overstreet replied, "I took a girl."

Scott proceeded to a remote area of Camp Atterbury and watched as Overstreet got out of the van. Scott claims to have covered his eyes as his brother opened the rear sliding door and removed the girl from the back of the van. Overstreet asked Scott to come back and pick him up in about an hour, but Scott refused. So instead, Overstreet instructed Scott to call Overstreet's wife Melissa and have her come to a rifle range near Camp Atterbury in two hours to pick him up. Scott left in the van and went as directed to Overstreet's home where he talked with his sister-in-law, Melissa Overstreet.

Melissa picks up the story from there. She testified that Scott came to her house early in the morning and told her what had just happened. She then drove Scott back to the motel in the van so Scott could retrieve his car. In the back of the van she noticed several empty shell casings and a can of mace that she had never seen before. Melissa then went to the rifle range as Scott had instructed her (at Overstreet's direction). She arrived there at about 3:30 am and spotted her husband. According to Melissa, as Overstreet approached the van, he was sweating, his shirt was unbuttoned, and he was carrying a blanket and a rifle. When Melissa asked why he was out so

late at the rifle range, Overstreet responded that if anyone asked concerning his whereabouts she should tell them that he was out that night drinking with friends.

Two days later, Melissa accompanied Overstreet to a car wash where he cleaned the back of his van. This was unusual; the van was essentially a piece of junk and hadn't been cleaned in years. According to Melissa, what made this especially odd was that, despite the fact that the entire inside of the van was filthy, Overstreet only cleaned the back of the van, ignoring everything else.

After Scott Overstreet told the police what had happened on the night in question, Scott led them to the spot at Camp Atterbury where he had dropped his brother off. Near that location the police found several of Eckart's personal items, still there a month after the murder. This, along with the statements from Scott Overstreet, led to the securing of a search warrant for Overstreet's home. In executing the warrant, police found the blanket Overstreet was carrying the night Melissa picked him up at the rifle range. They also recovered a hand-drawn map of an area of Brown County near Camp Atterbury depicting the area where Eckart's body was discovered. Fibers recovered from Eckart's shirt were consistent with fibers taken from the blanket. And fibers found on Eckart's overalls were consistent with fibers recovered from inside Overstreet's van. The police also noticed damage to the front bumper of Overstreet's van which was consistent with damage to the rear bumper of Eckart's car suggesting that the two had a fender-bender on the night Eckart disappeared.

An already strong case became airtight when DNA testing revealed that sperm found inside Eckart's body and on her underwear was consistent with that of Overstreet. The State's expert, a Professor of Medical Genetics at Indiana University School of Medicine, testified that

the sample was consistent with Overstreet's profile and found that it occurs in 1 in 4 trillion people.

The State charged Overstreet with murder, felony murder, rape as a Class B felony, and confinement as a Class B felony in Johnson County Superior Court. The State sought the death penalty based on three aggravating circumstances: (1) that Overstreet committed the murder while also committing or attempting to commit rape; (2) that Kelly Eckart was the victim of rape for which Overstreet had been convicted; and (3) that Kelly Eckart was the victim of confinement for which Overstreet has been convicted.

The trial was held from April 24 through May 18, 2000, and Overstreet was convicted on all counts. At the time of Overstreet's trial, under Indiana law, the jury made a recommendation to the judge as to whether the death penalty should be imposed but ultimately it was for the court to decide the sentence. In Overstreet's case, the jury recommended the death penalty. After conducting an independent evaluation, the trial court accepted the jury's recommendation. Among other things, the trial court determined that the State proved beyond a reasonable doubt that at least one of the charged aggravators – the intentional killing while committing rape – outweighed Overstreet's mitigating evidence including evidence of his mental illness. The Court therefore found that death was the appropriate sentence. The trial court entered judgment sentencing Overstreet to death for murder, and imposing consecutive sentences of twenty years for each of the rape and criminal confinement convictions.

On direct appeal the Indiana Supreme Court affirmed Overstreet's convictions and death sentence. *Overstreet I,* 783 N.E.2d 1168. Overstreet filed a petition for post-conviction relief, and an evidentiary hearing was held and presided over by the same judge who presided at trial.

Eventually, the post-conviction court denied the petition in an 86-page order entitled Findings of Fact, Conclusions of Law and Judgment on Petition for Post-Conviction Relief. ECF 25-16 at 4.[1] On November 27, 2007, the Indiana Supreme Court affirmed the denial of post-conviction relief. *Overstreet II*, 877 N.E. 2d at 175.

The present petition for habeas relief under 28 U.S.C. § 2254 followed.  As might be expected, the briefing is extensive. I held a lengthy oral argument on the petition and will now resolve all of the issues presented.

## DISCUSSION

Overstreet presents eleven grounds for relief in his habeas corpus petition. Additional facts and applicable legal standards are provided as necessary in each section below.

### Ground I:  Ineffective Assistance of Counsel -- Conveyance of the Plea Agreement

Overstreet's first ground for relief is that his two trial lawyers were ineffective for failing to meaningfully convey to him the State's offer of a plea agreement. The offer was the standard one frequently seen in capital cases: plead guilty, be spared the death sentence but receive life imprisonment without parole.  The gist of this first argument is that at the time the plea was presented to Overstreet, he claims to have been "acutely psychotic" and unable to effectively evaluate the plea offer. ECF 16 at 21. The resolution of this issue requires the navigation of

---

[1] Some of the state court record for this case is contained in the court's electronic case filing system, but much of it is stored solely on paper. In this opinion, I will be using three abbreviations for citations to the record:
    "TR" for the paper record of the state court trial,
    "PC" for the paper record of the state post-conviction proceedings, and
    "ECF" for this court's electronic case filing system.
There is one hiccup. Because this case was filed prior to the implementation of the current version of CM/ECF, sub-document links on the docket sheet are not properly associated with sub-documents of the same number. Therefore, to access material stored as a sub-document, it is necessary to use the document selection menu which can be reached by first selecting the main document on the docket sheet. Thankfully, in this opinion, the issue only arises with citations to the sub-documents of ECF 25. So to reach ECF 25-16, first select document 25, then select 16 from the document selection menu.

several procedural hurdles. Ultimately, however, I find that there is no basis for habeas corpus relief because the state court's determination that Overstreet's lawyers were not ineffective in how they handled the plea was not an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

A.

The State first argues that this ground is procedurally defaulted because it was not fairly presented to the Indiana Supreme Court. "Fair presentment requires [that] . . . both the operative facts and controlling law must be put before the state courts." *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) (quotation marks and citations omitted). "Fair presentment, however, does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Id.* at 814-15.

Here, the State is mistaken: Overstreet did raise this claim during his post-conviction appeal to the Indiana Supreme Court. In Argument I of his appellate brief, Overstreet specifically titled one of the sections the following: "Failure to protect Overstreet's rights when he became acutely psychotic." ECF 25-14 at 46. The core of this argument was that trial counsel was ineffective for communicating the plea agreement to Overstreet at a time when he was experiencing a significant psychotic episode and thus could not have fully appreciated the offer. *Id.*

Though worded differently, the argument presented to the Indiana Supreme Court in the post-conviction appellate brief is the same as the one presented in this habeas petition. The controlling law is the same: *Strickland*. The alleged facts are the same: while counsel were presenting the plea offer, Overstreet experienced a psychotic break. Nevertheless, the State

7

argues that Overstreet has added a new legal theory by citing to *Pate v. Robinson*, 383 U.S. 375 (1966) and *Drope v. Missouri*, 420 U.S. 162, 171 (1975). ECF 33 at 16. Perhaps the confusion as to whether this issue was fairly presented to the Indiana Supreme Court arises because Overstreet's brief to the Indiana Supreme Court focuses more attention on the failure to request a continuance of trial than the failure to meaningfully communicate the plea offer. But this strikes me as hair-splitting. The bottom line is that the operative facts and controlling law were presented to the Indiana Supreme Court. So this claim was not procedurally defaulted.

B.

Next I have to address the parties' disagreement as to the applicable standard of review on this claim.  The deferential standard of review provided for in § 2254(d) applies "to any claim that was adjudicated on the merits in State court proceedings."  Overstreet argues that the Indiana Supreme Court did not adjudicate the merits of this claim, and cites to *Canaan v. McBride*, 395 F.3d 376, 383 (7th Cir. 2005), which held: "When a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been 'adjudicated on the merits' for purposes of § 2254(d)." *Id.* Under *Canaan*, if there is no state court adjudication on the merits, then the deferential standard of § 2254(d) does not apply, and habeas petitions are instead governed by the more general standard of § 2243 which requires courts to dispose of petitions "as law and justice require."  *Canaan*, 395 F.3d at 383; 18 U.S.C. § 2243.

It is undisputed that the Indiana Supreme Court did not discuss the issue – whether counsel was ineffective for improperly conveying the State's plea offer – in either of its two opinions. Nevertheless, the State argues that it did adjudicate this issue on the merits because it generally found that trial counsel was not ineffective and affirmed the rulings of the post-

conviction court which *did* specifically address this claim. *Overstreet II*, 877 N.E. 2d at 175 and
ECF 25-16 at 50-52.

"When a federal claim has been presented to a state court and the state court has denied
relief, it may be presumed that the state court adjudicated the claim on the merits in the absence
of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562
U.S. __, __; No. 09-587, slip at 9; 2011 WL 148587; 2011 U.S. LEXIS 912 (January 19, 2011).
Here, there are no indications that the Indiana Supreme Court did anything other than summarily
affirm the post-conviction court.

Even before *Richter*, the U.S. Supreme Court held that "[w]here there has been one
reasoned state judgment rejecting a federal claim, later unexplained orders upholding that
judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S.
797, 803 (1991); see *also Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990) (It is
"sensible to look past the silence to the decision of the next state court in the chain."); *Mahaffey
v. Ramos*, 588 F.3d. 1142, 1146 (7th Cir. 2009).

Overstreet attempts to counter all this with *Canaan*, but that case simply stands for the
unsurprising proposition that when *no* state court decides an issue, there isn't an adjudication on
the merits under § 2254(d), and thus § 2243 governs instead. But this analysis is inapplicable to a
situation like this one where *there is* a lower court decision on the merits – the one made by the
trial court on post-conviction review – which the state supreme court affirmed, albeit without
specifically addressing the issue.

Overstreet also relies on *Liegakos v. Cooke*, 106 F.3d 1381, 1388 (7th Cir. 1997), but that
case doesn't help him either. In *Liegakos*, the state appellate court abandoned the merits review

done in the lower court and replaced it with a procedural decision. Thus, when the Seventh Circuit overturned the state court's procedural determination, there were no remaining merits analysis to which to give deference. By contrast, in this case, the Indiana Supreme Court did not disturb the lower court's ruling. Rather, it affirmed it across the board, albeit without discussing the particular issue at hand.

While I concede that it's a bit odd to say that the Indiana Supreme Court adjudicated a claim "on the merits" when it clearly made no mention of the claim, § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits. *Harrington v. Richter*, 562 U.S. __, __; No. 09-587, slip at 10; 2011 WL 148587; 2011 U.S. LEXIS 912 (January 19, 2011). The Indiana Supreme Court did not deny this claim for a procedural reason; rather it was silent. As such, it is exactly the type of unexplained opinion that *Ylst* found rested upon the same ground as the prior reasoned judgment of the lower state court.

Because the state post-conviction court reached the merits of this claim, my review of the matter is not *de novo*. Habeas corpus may not be granted on this ground unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

C.

In addressing this claim of ineffectiveness of trial counsel, the post-conviction court correctly identified *Strickland* as the applicable legal standard. ECF 25-16 at 17-18. *Strickland* requires a petitioner to establish that counsel's performance was deficient and that he was

prejudiced as a result. This requires a showing that the errors were so serious as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. There is a strong presumption that counsel acted effectively. *Id.* at 690. And in evaluating counsel's performance, a reviewing court should resist the temptation of engaging in Monday morning quarterbacking of counsel's trial strategy. *Id.* at 689. *See Harrington v. Richter*, 562 U.S. __, __; No. 09-587, slip at 15; 2011 WL 148587; 2011 U.S. LEXIS 912 (January 19, 2011).

The *Strickland* bar is a high one, and surmounting it is never easy. *Padilla v. Kentucky*, 559 U.S. __, __; 130 S. Ct. 1473, 1485; 176 L. Ed. 2d 284, 297 (2010). Indeed, establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is doubly difficult. This is because "[w]hen § 2254(d) applies [as it does here], the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. __, __; No. 09-587, slip at 16; 2011 WL 148587; 2011 U.S. LEXIS 912 (January 19, 2011).

Here is how the post-conviction court explained why it was denying relief on this claim:

> **Findings of Fact:**
> Despite the fact that Petitioner did not indicate in any manner a willingness to accept a plea agreement, Nugent and Baldwin [petitioner's trial counsel] presented such an offer to Petitioner, an offer of life without parole, while he was in safe keeping at the Pendleton Correctional Facility. (Tr. 24-25, 42-43, 55-58). On that occasion, they took members of Petitioner's family with them in an effort to convince Petitioner that the offer was in his best interest. (Tr. 24-25). At the P.C.R. hearing,[2] Baldwin testified that he did not seek leave of Court for additional time to present the State's offer of a plea agreement to

---

[2] "P.C.R." is post-conviction review.

Petitioner, because it was not until April that he felt negotiations had reached a point where an agreement may have been reached, and he was still unsure if there was a firm plea offer available to the Petitioner. (P.C.R. 57-58).

At the P.C.R. hearing, McDaniels testified that Nugent and Baldwin should have attempted to get a continuance of the trial based on the grounds that their attempts to negotiate a plea agreement exacerbated Petitioner's mental condition, may have caused Petitioner to suffer a psychotic break and that counsel was uncertain of Petitioner's ability to seriously consider a plea agreement. (P.C.R. 756-60). Johnson testified that Nugent and Baldwin "did the right thing" by having Coons re-evaluate Petitioner following the psychotic break, but felt that more should have been done to help Petitioner deal with the plea negotiations. (P.C.R. 838-43).

**Conclusions of Law:**

The evidence at the P.C.R. hearing leads to the reasonable conclusion that counsel had no indication prior to trial that Petitioner had any intention of accepting a plea agreement, and they had no reasons to think that additional time to present an offer would have benefitted Petitioner. Counsel was not ineffective for failing to request more time to present an offer which Petitioner had shown no signs of accepting. The chronological case summary in this case indicates that the jury trial had been set to commence on April 4, 2000, since the Court set it on July 15, 1999, and jury dates had been continued four (4) previous times on defense motions. It is highly doubtful that the court, given all the arrangements necessary for a sequestered jury in a lengthy trial, would have favored a continuance. Further, there was no evidence presented at the P.C.R. hearing that any temporary psychosis Petitioner may have suffered did not fully resolve before the trial commenced, allowing counsel and Petitioner additional time to discuss any plea that was available. Since this Court must presume that the conduct of counsel was effective and the Petitioner has the burden of proving to the contrary, the Court now finds and concludes that considering the totality of the evidence in this case as related to this issue, counsel acted well within an objective standard of reasonableness. Although Johnson felt that more could have been done to help Petitioner deal with the plea negotiations, he did not offer what more there was that could have been done, nor does the court now conclude that counsels' conduct was deficient. For all the foregoing reasons the Court concludes that Petitioner's claim is without merit.

ECF 25-16 at 50-52 (inconsistent citation formats to the same transcript – Tr. and P.C.R. – in

original).

D.

The crux of Overstreet's argument is that trial counsel did not effectively communicate the plea offer to Overstreet because he "was acutely psychotic at the time." ECF 16 at 21. But the evidence Overstreet relies on for the factual predicate of this claim fails to support the propositions for which it is cited. Instead, Overstreet cites to ambiguous testimony that does not clearly delineate whether the plea was rejected nor explain precisely when the psychotic break occurred. And in fact there is evidence that Overstreet was completely lucid at the time the plea offer was communicated to him.

Overstreet cites the testimony of one of his trial attorneys, Peter Nugent, about the meeting where he discussed the plea offer with Overstreet. But Nugent's recitation of events does not provide any details about the actual discussion of the plea offer. Nor does he mention any peculiar behavior by Overstreet while he was in the room with him having those discussions. Rather he merely describes the behavior he observed through a window from an adjoining room *after* he explained the offer to Overstreet. PC at 22-24. What seems clear is that Overstreet became extremely upset after his lawyers presented the offer to him. More on that in a moment when I discuss Overstreet's sister's testimony.

Neither does the testimony of Dr. Engum (during the PCR hearing) support Overstreet's argument that he was "acutely psychotic" when the plea was explained to him. Dr. Engum testified that Overstreet had a brief psychotic episode on March 22, 2000 (the day the plea was presented to him). The problem is that Dr. Engum did not testify *when* that episode occurred in relation to the plea offer. TR at 5123-28. Nor does the contemporaneous report that he wrote,

which was introduced at the PCR hearing, shed light on the timing of the psychotic episode in relation to the plea offer. PC Exhibit 33 at 22.

By contrast, the testimony of Overstreet's sister provides substantially more detail about the discussion of the plea offer and the timing of the psychotic break. Her uncontroverted testimony was that the plea offer was discussed with Overstreet, and he rejected it because he would not agree to plead guilty to a crime he could not remember committing. Thereafter, in a separate room from counsel, he had what Dr. Engum called a "psychotic break." Here's her testimony on that subject:

> Q    Do you know if your brother was ever offered a plea agreement (INAUDIBLE) death penalty?
> A    Oh yeah.
> Q    And did you ever talk to your brother about that?
> A    Huh-uh.
> Q    How, how many times do you think you talked to him about it?
> A    Only the one time.
> Q    Only the one time? And where was that?
> A    We went to see him, I think it was at Pendleton.
> Q    At Pendleton?
> A    I went, his attorney, Peter Nugent maybe . .
> Q    Mr. Nugent?
> A    Yeah.
> Q    Huh-uh.
> A    Took me out there to, took me and my husband and there was a Brock guy.
> Q    Steve Brock?
> A    And a doctor.
> Q    Dr. Engum?
> A    Yeah.
> Q    And is it fair to say your [sic] were encouraging him to, to take the offer I assume?
> A    Yeah.
> Q    And what was his response?
> A    He just said he couldn't do it.
> Q    Why?

| | |
|---|---|
| A | 'Cause he said that he didn't want to take the plea agreement 'cause then that was admitting his guilt and he didn't, you know, didn't want to say he did something he didn't know. |
| Q | He didn't remember, didn't know? |
| A | Right. |
| Q | During that meeting up there at the reformatory, did there come a time when he started acting a little different? |
| A | Yeah. |
| Q | Tell us about that. |
| A | Well we were, after we left the one room discussing the plea agreement, we walked through to like the visiting area and there's a box area that's see through. And me and Dean [the petitioner] and my husband went in there to talk about something, I don't know, I think maybe the doctor was in there with us. I don't know, might have been just us three, but just, I was getting upset because his attorneys are telling me "He's got to do this, you've got to talk him into it." and he wasn't budging and I couldn't figure out. So I was getting upset, you know by talking to him. And then all of a sudden he just drew this blank look and looked at me and said something about the, some kind of angel, the Michael angel, or something, something out of the Bible that I'm not familiar with. And I looked at him and I just waved for the attorneys and doctors to come in there because he looked different and his eyes looked different to me, and I don't know where he was, I mean just out of the blue to talk about what he mentioned, and I didn't want to see that if, if, if he had the, the disorder that they said, the multiple disorder or whatever. I didn't want to see none of that. I didn't, 'cause he definitely switched something. |
| Q | Was it kind of freaking you out? |
| A | Oh definitely. |
| Q | Tell the doctor he was acting a little crazy? |
| A | Huh-uh, well I just said he acted weird, I said he drew this blank look and then just said something that didn't make any sense to me, but I don't know, it must have been like a quote of the Bible or something. |

Testimony of Shannon Richardson, PC at 395-97.

This testimony from Overstreet's sister does not support the claim that Overstreet was psychotic at the time that the plea offer was presented to him. To the contrary, based on her uncontradicted description of events, the plea offer was communicated to Overstreet, his lawyers strongly encouraged him to take the deal, and Overstreet's sister unsuccessfully attempted to "talk him into" taking the deal. It was only thereafter that the psychotic break occurred. In sum,

the record supports the conclusion that the plea agreement was communicated to Overstreet during a time in which he was lucid. He rejected the plea and became upset only after those who were present continued to implore him to take the deal.

The PCR court's conclusion that Overstreet's lawyers were not ineffective in how they presented the plea offer is well supported and is not contrary to *Strickland*. The court found that: "Despite the fact that Petitioner did not indicate in any manner a willingness to accept a plea agreement, Nugent and Baldwin presented such an offer to Petitioner, an offer of life without parole, while he was in safe keeping at the Pendleton Correctional Facility." ECF 25-16 at 51. The court concluded that counsel "had no reasons to think that additional time to present an offer would have benefitted Petitioner." ECF 25-16 at 51. This was because Overstreet consistently denied having any memory of the crime.

Here is the nub of the predicament that Overstreet's lawyers were in: Overstreet's claimed lack of memory of the murder made it impossible for him to plead guilty. This is because under Indiana law, a defendant who pleads guilty must state a factual basis for the plea. While some states permit "Best Interest" or *Alford* pleas, they are not required to do so. *North Carolina v. Alford*, 400 U.S. 25, 38 n.11 (1970) ("States may bar their courts from accepting guilty pleas from any defendants who assert their innocence.") And Indiana chooses not to permit such pleas. *Carter v. State*, 739 N.E. 2d 126, 128-29 (Ind. 2000) (summarizing Indiana's history of rejecting "Best Interest" pleas). *See Harshman v. State*, 115 N.E. 2d 501, 502 (Ind. 1953).

So despite the fact that the evidence of his guilt was devastating and overwhelming, Overstreet steadfastly refused to accept the plea agreement because he maintained that he had no

memory of the crime. This fact foreclosed any possibility of the case being resolved by a plea agreement.

If it is true that Overstreet had no memory of the crime, this put him in a difficult position of being forced to trial for a gruesome rape and murder that he was almost certain to be convicted of. And then after hearing the evidence, a jury wasn't likely to have mercy on Overstreet, and they didn't. One could reasonably question the wisdom of Indiana's hard and fast rule against accepting *Alford* pleas, but that is a matter for the Indiana Supreme Court to address, not me.

One final matter: Overstreet argues that, even if he "had initially refused the offer, psychotic or not, trial counsel were under a continuing obligation to continue their efforts because as ABA Guideline 10.9.1(e) notes a 'client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.'" ECF 38 at 32; *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.9.1(E) (2003). There are two problems with this argument. First, the Supreme Court has held that the 2003 ABA Guidelines are not applicable to trials, like this one, that occurred prior to their issuance. *Bobby v. Van Hook*, 558 U.S. __, __, 130 S.Ct. 13, 17, 175 L. Ed. 255, 259 (2009) ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines – without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial – was error.") Furthermore, as discussed above, because Indiana does not accept *Alford* pleas, he could not have been prejudiced in this case even if trial counsel had never tried to present the plea offer to him because Overstreet claimed to have no memory of the crimes.

E.

After oral argument was held, Overstreet filed a notice of additional authority. In it he cites to *Holmes v. Levenhagen*, 600 F.3d 756 (7th Cir. 2010), and argues that "[a]s to trial counsel's duties when the psychotic break occurred in Petitioner's case, *Holmes* supports Petitioner's arguments that efforts should have been made to maintain the *status quo* to protect Petitioner's best interests, the life plea . . .." ECF 56 at 2.

In *Holmes*, the petitioner was found to be mentally incompetent and unable to assist his lawyers in the preparation and prosecution of his habeas petition in both the district court and on appeal. As a result, his habeas proceeding was suspended – indefinitely – until the state is able to provide substantial evidence that his mental illness has abated. Here, Overstreet is not arguing that he is unable to assist his attorneys with this habeas corpus proceeding. Neither is he arguing that he was not competent to stand trial in 2000. He is not even arguing that he was not competent to assist his trial lawyers with the preparation for his trial. Rather he is arguing that because he experienced a temporary psychotic break, his attorneys were ineffective because they did not delay his trial – and maintain the status quo – so that he could later accept a plea bargain which would have resulted in a sentence of life imprisonment.

There are many problems with this argument. First, the facts of this case do not support the contention that counsel did not consult with Overstreet about the guilty plea, nor do they support the contention that Overstreet did not reject that offer before the psychotic break. In fact, the uncontroverted evidence is exactly the contrary: he was presented the offer, he unequivocally rejected it, then he had a psychotic break – perhaps because his lawyers and his family continued to pressure him to take the plea. Second, because a guilty plea could not have been accepted by

18

the court, failing to maintain the *status quo* that Overstreet now argues should have been maintained could not have been prejudicial. He could not have ever accepted the plea offer because he was unable to provide a factual basis for a plea. Third, trial counsel's response to the psychotic break was not deficient because after it occurred, they had a defense psychiatrist, Dr. Philip Coons, re-assess Overstreet. PC at 436-37 and 454-55. When Dr. Coons examined Overstreet, he found that though he still had some symptoms, he had improved. PC at 54. Fourth, this case does not contain a claim for habeas corpus relief premised on Overstreet's inability to properly communicate with counsel to prepare for trial. Neither is there any indication that he was otherwise unable to do so during the approximately two years that they had to prepare for trial. For these reasons, I do not find that *Holmes* is relevant or helpful in evaluating this claim.

\* \* \*

To sum up: there are no grounds for habeas relief in how Overstreet's lawyers handled the plea offer. The record in this case does not demonstrate that Overstreet was psychotic when counsel presented the plea offer to him. And the record further demonstrates that he was not psychotic when he rejected it. The lawyers presented the plea to Overstreet and implored him (with the help of his family) to take it. But because he claimed to have no memory of the crime, he was steadfast in his refusal to plead guilty to something that he could not recall doing. Under these circumstances, it was not unreasonable for the state court to find that counsel were not ineffective for the way the plea offer was presented.

### Ground II: Ineffective Assistance – Public Symbols of Mourning in the Gallery

Overstreet's next claim is that "Trial counsel deprived Petitioner of the effective assistance of counsel at Petitioner's trial as guaranteed by the Sixth, Eighth and Fourteenth

Amendments to the United States Constitution in their failure to object to prejudicial symbols of mourning in the gallery." ECF 16 at 25. This ground relates to the fact that people sitting in the gallery of the courtroom during trial wore buttons with a photograph of the victim. This ground presents no basis for habeas corpus relief because the Indiana Supreme Court did not unreasonably apply *Strickland* when it held that Overstreet had not demonstrated that his counsel's performance was deficient for failing to object.

A.

Overstreet concedes that the Indiana Supreme Court addressed this claim and denied it on the merits. ECF 38 at 37. Because the Indiana Supreme Court reached the merits of this claim, habeas corpus may not be granted on this ground unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Overstreet contends that the Indiana Supreme Court – in deciding whether the spectator buttons deprived him of a fair trial – failed to correctly analyze *Holbrook v. Flynn*, 475 U.S. 560 (1986). ECF 38 at 37. *Flynn* held that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial unless justified by an essential state policy or interest. *Carey v. Musladin*, 549 U.S. 70, 75 (2006). Overstreet argues that spectators wearing buttons is just such a courtroom practice. The problem with this argument is that *Musladin* explicitly held that no United States Supreme Court case, *Flynn* or otherwise, has ever clearly

established that the display of symbols of mourning by spectators at a criminal trial is inherently

prejudicial. Here's what the Supreme Court said:

> Given the lack of holdings from this Court regarding the potentially
> prejudicial effect of spectators' courtroom conduct of the kind involved here, it
> cannot be said that the state court unreasonably applied clearly established
> Federal law. No holding of this Court required the [State Court] to apply the test
> of *Williams* and *Flynn* to the spectators' conduct here. Therefore, the state court's
> decision was not contrary to or an unreasonable application of clearly established
> federal law.

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (quotation marks, brackets, and citation omitted).  So

too here. The Indiana Supreme Court did not apply *Flynn*, nor was it required to do so. When

United States Supreme Court cases fail to give a clear "answer to the question presented, let

alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied

clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (quotation

marks, brackets and citation omitted).

## B.

What the Indiana Supreme Court properly did was apply *Strickland* to this claim.

*Strickland* requires that the petitioner prove both deficient performance and prejudice severe

enough to make the results of the trial unreliable. *Strickland*, 466 U.S. at 687. Here's what the

Indiana Supreme Court said on the issue:

> In this case Overstreet has not shown that counsel rendered deficient
> performance for failing to object or otherwise move the trial court for an order
> directing spectators not to wear buttons. For example, there is nothing in this
> record that tells us the size of the buttons, how easy it was for the jurors to see the
> picture on the buttons, the number of spectators wearing the buttons, how many
> days of trial the buttons were worn or, more importantly, whether any juror was in
> any way affected by the buttons. On this record it is simply impossible to
> determine whether the risk of any improper considerations rose to an
> unacceptable level. It is only at the unacceptable level of risk that any plausible

argument can be made that counsel's inaction fell below the objective standard of
reasonableness.

*Overstreet II*, 877 N.E. 2d at 159.

It is undoubtedly true that some spectator behavior could be so egregious that counsel
would be ineffective for not objecting to it. Suppose during a trial spectators displayed a banner
in the gallery proclaiming "KILL HIM!" Under such a circumstance, counsel would clearly be
deficient for not objecting. But there is no indication that the activities of the spectators in
Overstreet's trial were in any way extreme. More importantly, because Overstreet did not present
sufficient evidence during his post-conviction proceeding of an "unacceptable level of risk" to
the impartiality of the jury as a result of these buttons, he did not create a "plausible argument"
that his trial counsel's performance was deficient. *Id.* The Indiana Supreme Court did not
conclude that the behavior of either counsel or the spectators was appropriate. Rather it
concluded that Overstreet had not provided the court with sufficient information to prove that his
trial counsel had anything meaningful to object to. In short, he simply did not carry his burden.

Overstreet criticizes the Indiana Supreme Court for its "fail[ure] to mention that
Petitioner has presented the unchallenged affidavits from four jurors who swore they saw the
buttons, during trial, and recognized them for what the[y were.]" ECF 45 at 8. But the Indiana
Supreme Court's opinion did acknowledge the four juror affidavits. Here's what the court said:

> Affidavits from four jurors were also introduced. Although worded slightly
> differently they provided in relevant part, "I was able to observe spectators in the
> courtroom. Some of these people wore ribbons and button[s] with pictures of
> Kelly Eckart." App. at 793, 797, 799, 801.

*Overstreet II*, 877 N.E. 2d at 157. But just because some jurors may have seen the buttons, does
not mean that they had an effect on the outcome of the trial. Given the record in this case, which

the Indiana Supreme Court explicitly acknowledged, I cannot find that the application of *Strickland* was unreasonable.

C.

Overstreet argues that this result is contrary to the Seventh Circuit's holding in *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005), but *Wisehart* does not address public symbols of mourning. Rather it addresses private jury communications which *Remmer v. United States*, 347 U.S. 227, 229 (1954), held amounts to jury tampering and is thus presumptively prejudicial. In those situations, as the Seventh Circuit pointed out, the presumption is not conclusive, but the burden rests heavily upon the Government to establish that such contact with the jury was harmless to the defendant. *Wisehart*, 408 F.3d at 326, *citing Remmer*, 347 U.S. at 229.

Because private communications with jurors are presumptively prejudicial, *Wisehart* (as required by clearly established Supreme Court precedent) placed the burden on the state to produce evidence to rebut that presumption. But as *Musladin* makes clear, there is no clearly established law that public displays in the gallery are presumptively prejudicial. This distinction is critical because here the burden was on Overstreet to produce evidence demonstrating that his trial counsel was deficient for not objecting to the public displays – the buttons – in the gallery. Based on what he produced, the Indiana Supreme Court reasonably held that he had not demonstrated that his attorneys provided him with ineffective assistance.

D.

Given the ruling of the Indiana Supreme Court, Overstreet seeks discovery pursuant to RULE 6 of the RULES GOVERNING SECTION 2254 CASES to determine just how prejudicial the

spectator buttons were.[3]  In particular, he seeks depositions from the jurors and trial counsel

relating to the buttons, as well as an order from this Court requiring the State to produce one of

the buttons for inspection. ECF 39 at 9-10.  That is, Overstreet wants to do here what he did not

do in the post-conviction proceeding: seek additional evidence about the buttons to prove that his

lawyer should have objected to them.

But a habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to

discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). "A judge may, for

good cause, authorize a party to conduct discovery" but a "party requesting discovery must

provide reasons for the request." SECTION 2254 RULE 6.  In addition to the "good cause" standard

of Rule 6, Overstreet must contend with the limitations of § 2254(e)(2).  On its face, the

language of § 2254(e)(2)(A)(i) and (ii) provides that a habeas petitioner cannot have an

evidentiary hearing in federal court if he failed to develop the factual basis of a claim in the state

court proceedings, unless his claim is based on a new and retroactive rule of constitutional law or

he shows that the "factual predicate...could not have been previously discovered through the

exercise of due diligence."  Overstreet argues that the Rule 6 standards for obtaining discovery

are different than the § 2254(e)(2) standards for the granting of an evidentiary hearing. But

courts have found that the statutory standard has broader implications for federal habeas relief

sought on the basis of evidence that was never presented to the state courts and therefore to

requests for discovery in federal habeas cases.

The U.S. Supreme Court has held that the "same restrictions [of § 2254(e)(2)] apply *a

fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing."

---

[3] The discovery motion (ECF 39) also seeks discovery related to other issues as well, but here I discuss only those portions related to the spectators' displays of mourning in the gallery.

*Holland v. Jackson*, 542 U.S. 649, 653 (2004) (emphasis in original). It is true that there are cases holding that discovery and expansion of the record can be used to determine "whether an evidentiary hearing is necessary or proper." *Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001). But those same cases comment that "[w]hen expansion of the record is used to achieve the same end as an evidentiary hearing, the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing." *Id.*

Overstreet has not provided any plausible explanation for how the discovery he seeks could be useful for any purpose other than to obtain habeas corpus relief by demonstrating that he was prejudiced by his counsel's deficient performance. Indeed, that is his stated goal: "If the facts are more fully developed via the above depositions or production of the button or any other symbol of mourning, Petitioner will be able to demonstrate that he is entitled to relief." ECF 39 at 15. But this is precisely what the Seventh Circuit has prohibited:

> [The petitioner]'s ultimate goal in this case is to introduce the transcript into the record and to have a federal court evaluate his ineffective assistance of counsel claims in light of the information in the transcript. Regardless of the procedural device through which [the Petitioner] seeks to accomplish this goal, he is asking that a federal court evaluate the merits of factual matters never presented to the state courts. Because § 2254(e)(2) restricts a petitioner's attempts to supplement the factual record, [the petitioner ] must satisfy that provision's requirements before he may place new factual information before the federal court.

*Boyko,* 259 F.3d at 790.

So Overstreet must satisfy one of the two parameters of § 2254(e)(2). The first precludes Overstreet from conducting discovery to obtain additional information about the buttons and the spectators' behavior in the gallery unless the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously

25

unavailable . . . ." § 2254(e)(2)(A)(i).   The only other way to obtain discovery is to demonstrate

that the "factual predicate . . . could not have been previously discovered through the exercise of

due diligence."  § 2254(e)(2)(A)(ii).  Neither exception applies here. Indeed, Overstreet has

neither made such an argument, nor do I find that there could be any basis for doing so. He has

made no assertion that he attempted to conduct discovery related to this claim, but was prevented

doing so; and in my review of the post-conviction record I have found no indication that he was

prevented from conducting any relevant discovery on this point. Because Overstreet did not

exercise due diligence during the state court proceedings, he may not now conduct discovery. 28

U.S.C. § 2254(e)(2).

*  *  *

In sum, the Indiana Supreme Court – based on the evidence that was presented to it –

found that Overstreet had not demonstrated deficient performance. That was not an unreasonable

application of Strickland.

### Ground III:  Failure to Disclose Witness Statement Prior to Trial

Overstreet next contends that his due process rights were violated when the State failed to

disclose the fact that Overstreet's wife intended to give incriminating testimony at trial which

was inconsistent with her prior statements. ECF 16 at 27. But because there is no federal

constitutional right to know in advance the content of inculpatory testimony, this ground presents

no basis for habeas corpus relief.

The focus of this claim is on two events: (1) the prosecution's failure to disclose that

Melissa Overstreet was expected to testify inconsistently with her prior statements, and (2) the

26

state trial court's denial of the motion for a mistrial as a result of that failure to disclose. The

Indiana Supreme Court explained how this issue got stirred up:

> Prior to trial, Melissa gave a statement to law enforcement on three
> occasions and testified before a grand jury. She was also deposed once. On each
> of these occasions, she stated either that she had no knowledge of Defendant's
> activities on the Monday following the offense or that she had no further
> information relevant to the investigation at all. The defense was apprised of these
> statements and testimony.
>
> During trial, however, Melissa testified that on the Monday following the
> offense, she, Defendant, and their four children took Defendant's van to the car
> wash but did not wash its exterior. She further testified that Defendant spent close
> to an hour cleaning the interior of the van from behind the driver and passenger
> seats to the bed area in the rear of the van. She also testified that Defendant
> showed no interest in cleaning the front passenger seats or the floorboard.
>
> In a hearing outside the presence of the jury, it was revealed that Melissa,
> accompanied by her attorney, had given the prosecution this version of Monday's
> events prior to trial. The prosecutor told the court that she had said she had not
> described the Monday happenings in her other statements because Defendant had
> physically abused her in the past and she feared what he might do to her in the
> future should he be acquitted knowing she had incriminated him. The State had
> not notified the defense about this development.
>
> The trial court found the withholding of this information to have been
> improper. While denying the Defendant's motion for a mistrial, the trial court
> prohibited the State from offering any evidence to rehabilitate Melissa following
> defense impeachment of her inconsistent statements to police. This, of course, had
> the effect of preventing the State from asking about domestic violence as a reason
> for the inconsistencies.

*Overstreet I*, 783 N.E. 2d at 1153-54.

Overstreet argues that his due process rights were violated by the State's failure to

disclose Melissa Overstreet's change of story. But the State wasn't obligated to produce

information about her expected adverse testimony before she testified at trial. This is because the

constitution doesn't mandate pretrial disclosure of inculpatory witness statements. *Weatherford*

*v. Bursey*, 429 U.S. 545 (1977); *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996);

*United States v. Jackson*, 452 F.2d 144, 147 (7th Cir. 1971); *see also* 18 U.S.C. § 3500(a). In

fact, under *Weatherford*, not only was there no constitutional requirement that the prosecution disclose the expected testimony of a particular witness, there is not even a requirement that the *identity* of a witness be revealed in advance.

The Indiana Supreme Court reviewed these facts under both state law and federal law. In discussing the state law prosecutorial misconduct claim, it held that "[a]lthough the State should have disclosed the evidence in question, the State's failure to disclose was adequately remedied by the trial court." *Overstreet I* at 1155. That conclusion was based on state law and so is beyond my review since habeas corpus relief can be granted "only on the ground that [the Petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). *See also Wilson v. Cocoran*, 562 U.S. __, __ 131 S.Ct. 13, 14 (2010) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law.")

In addressing the issue under the United States Constitution, the Indiana Supreme Court also correctly found that there was no error under *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court held that the evidence in question was actually inculpatory and in any event was disclosed at a time and in a manner that enabled the defense to adequately address it. *Overstreet I*, 783 N.E. 2d at 1154. From a real world perspective, the defense benefitted from the late disclosure because the trial judge – obviously peeved with the prosecutor's game-playing – prevented the State from explaining *why* Melissa Overstreet changed her story. She initially withheld the incriminating testimony about Overstreet's washing of the van because she feared him; he routinely beat her. The jury never heard this damaging testimony, which of course only benefitted Overstreet.

This case is a replica of *Moore v. Casperson*, 345 F.3d 474 (7th Cir. 2003), in which the Seventh Circuit denied habeas relief where a lab technician told the prosecution that she was going to be testifying inconsistently with her prior statements, but defense counsel was not told this until after she testified. As the court noted, "it was simply a question of a witness testifying differently from previous statements. That is a fact of life in the course of a trial. Defense counsel had all the previous statements, had more than adequate opportunity to impeach, and did so." *Id.* at 481. That's precisely what happened in this case.

Overstreet has not presented a claim that the failure to disclose Melissa Overstreet's new statement was a violation under *Giglio v. United States*, 405 U.S. 150, 154 (1972). *Giglio* stands for the proposition that, just as exculpatory evidence must be disclosed to the defense, so too must impeachment evidence. The Indiana Supreme Court addressed that question and found that there was no *Giglio* violation because the inconsistent statement was provided to Overstreet's lawyers well in advance of trial. *Overstreet I*, 783 N.E. 2d at 1154 n.12.

This was a correct understanding of what *Giglio* requires. Suppose a witness gives a statement that "the light was red" and that statement is given to the defense prior to trial. Suppose further that the witness changes his story during trial preparation and tells the prosecutor that actually "the light was green" and then goes on to testify to that at trial. A failure to disclose the change in stories would not be a *Giglio* violation. The impeaching statement – that "the light was red" – was disclosed prior to trial. And the statement that was not disclosed – that "the light was green" – is actually *consistent* with the trial testimony. In that situation the defense lawyer would have all that he would need to thoroughly impeach the witness.

That's essentially what occurred here. There was no *Giglio* violation by withholding Melissa Overstreet's statement about Overstreet's washing of the van because that statement was consistent with what she testified to at trial. And even if it could be argued that the statement should have been disclosed pretrial, Overstreet's lawyers received the information in time (albeit during trial) to make use of it, i.e., in time to impeach her – which they did. That is all that due process requires. *See Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) (due process is satisfied if the defense receives the evidence in time to make use of it).

### Ground IV:  Ineffective Assistance in the Guilt Phase

Overstreet next argues that trial counsel was ineffective during the guilt phase of trial. ECF 16 at 29. There are five sub-parts to this claim. The first four identify specific omissions of counsel and the fifth asserts cumulative prejudice. As explained below, none of these grounds for relief, whether taken individually or cumulatively, presents any basis for relief.

### A.

The first two deficiencies alleged by Overstreet are that trial counsel were ineffective for not properly impeaching two witnesses: Melissa Overstreet and Amanda Chittum. ECF 16 at 30-31. The allegedly inadequate impeachment of Melissa Overstreet is related to her testimony about the cleaning of the van discussed in the preceding section. Overstreet argues that his trial counsel possessed information contradicting Melissa Overstreet's van cleaning story yet never confronted her with it. Specifically, there was evidence that Overstreet was working on the Monday when he was supposedly cleaning the van thus calling into question Melissa Overstreet's damaging testimony on that subject. The evidence of Overstreet being at work when he was supposedly cleaning the van was disclosed to the defense.  But curiously Melissa

Overstreet was never questioned about the inconsistency. At the PCR hearing, Overstreet's trial counsel testified that if he had recalled this information, he would have used it to impeach Melissa Overstreet on this critical point. However, the jury never heard this testimony.

The allegedly inadequate impeachment of Amanda Chittum is related to her eyewitness identification of Overstreet several days after the murder. At trial, Chittum testified that a few days after the murder she saw Overstreet in his truck near where Ms. Eckart's body was found. Chittum did not report this until six weeks later, after she had seen Overstreet on the television news. Chittum admitted that she was driving 40 or 50 miles an hour when Overstreet, in his van, nearly pulled into her path. She saw the van and its driver for 2-10 seconds. Overstreet claims that his lawyers were ineffective for not calling an eyewitness identification expert like Dr. Roger Terry who testified at the PCR hearing concerning Chittum's identification of Overstreet. According to Dr. Terry, Chittum's eyewitness testimony was highly suspect and should have been vigorously challenged. According to Overstreet, his lawyers should have called Dr. Terry at trial to discredit Chittum's dubious testimony.

Overstreet argues that had the jury heard the testimony from Dr. Terry calling into question Chittum's eyewitness testimony, and had Melissa Overstreet been confronted with the evidence that Overstreet was working when she said he was cleaning the van, it was not likely that the jury would have either convicted him of murder or recommended a sentence of death. The Indiana Supreme Court disagreed. In applying *Strickland*, the court held that even assuming that trial counsel were deficient in how they handled these two witnesses, Overstreet was not prejudiced. Overstreet now argues that this was an unreasonable application of *Strickland*.

Though Overstreet makes a number of specific objections to the Indiana Supreme Court's reasoning, I need not consider them because even under a *de novo* review he has not demonstrated prejudice. "Courts can . . . deny writs of habeas corpus under §2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* §2254(a)." *Berghuis v. Thompkins*, 560 U.S. __, __, 130 S.Ct. 2250, 2265, 176 L. Ed. 2d 1098, 1105 (2010).

To establish prejudice under *Strickland*, Overstreet "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This means that errors that are isolated or trivial are not likely to meet this standard especially when the verdict is strongly supported by other evidence. *Id.* at 695–96. Overstreet argues that this error affected the result of his trial and his sentencing in several different ways. I will address each of them in turn.

The claim that a more vigorous cross examination of Melissa Overstreet and Amanda Chittum would have led to a different result in the guilt phase of the case borders on frivolous. The evidence against Overstreet was truly overwhelming. There is no conceivable way that the result of the trial would have been different even if Overstreet's attorneys had challenged these two witnesses as he now suggests. Consider: (1) his brother's testimony placing Overstreet at Camp Atterbury on the night of the murder; (2) that Eckart's personal belongings were found there even though her abandoned vehicle was miles away; (3) that Overstreet admitted to Scott that he "took a girl" and he had a hand-drawn map of the area (again miles away) where Eckart's

body was found; (4) fibers found on her clothing were consistent with fibers from Overstreet's blanket and van; (5) Overstreet's van had damage consistent with the damage to Eckart's car; and (6) most overwhelming, sperm found inside Eckart's body was a DNA match with Overstreet. Even if the jury had concluded that the cleaning of the van was purely a fabrication and that there was no evidence that Overstreet had been driving in the area where the victim's body was found on September 30, 1997, he would have still been convicted of murder, rape, and criminal confinement. That is to say, even without this alleged impeachment error and with the expert testimony, the jury would still not have had any reasonable doubt about Overstreet's guilt.

Despite his arguments to the contrary, neither would Overstreet have received a sentence other than death. According to Overstreet, if Melissa Overstreet and Amanda Chittum had been properly impeached, then the trial court would not have found that he had a "lurid mind." TR at 1294 at ¶ 16. Overstreet argues that these two segments of testimony were used by the trial court to substantially augment the weight given to the aggravating circumstances and to discount the mitigating circumstances. This is a stretch. I cannot accept that this testimony was nearly as important as Overstreet makes out. In reality, a whole host of other facts led to the judge's decision. Here's what the judge said in the sentencing order:

> 1) The Defendant approached Kelly Eckart's vehicle, debilitated her by shooting her with a gun held at close range to her forehead, and abducted her defenseless body from her parked vehicle in the middle of the night on September 26, 1997. The Defendant left the victim's vehicle where he encountered it; at the intersection of Earlywood Drive and Graham Road in Franklin, Indiana. The Defendant did not personally know his victim. The victim was traveling alone on her way home from an evening of work.

> 2) The Defendant drove his van (with the victim most likely unconscious in the back) to the Days Inn in Franklin, Indiana. Fiber analysis results are consistent with other evidence that the Defendant wrapped the victim in a blanket and concealed her in the back of his van. The Defendant elicited the help of his

younger brother, Scott Overstreet, to drive him and the victim in the Defendant's van to the Atterbury Fish and Wildlife Area in Edinburgh, Indiana. The Defendant did not tell his brother about how he abducted Kelly Eckart or that she had been shot and was not conscious, but the Defendant did tell his brother that he "took" a girl and warned his brother by saying "Don't let me down".

3) The Defendant removed Kelly Eckart from the back of his van, her body still unresponsive, and Scott Overstreet left the Defendant and the victim at a remote area in Atterbury.

4) The D.N.A. test results are consistent with the other evidence that the Defendant raped Kelly Eckart at Atterbury. Based upon the evidence, it is reasonable to conclude that the victim was either unconscious or that she drifted in and out of consciousness during the time she was raped. There is no evidence that the victim attempted to defend herself from the brutal and vicious attack of the Defendant. The victim wore overalls and the straps from the overalls were either torn from the body of the overalls or cut away therefrom, either of which would require a great amount of force. Kelly Eckart's personal effects were haphazardly strewn about the area. Her earrings, necklace, and hair tie, among other items, were found near the area where the Defendant raped her, further evidence that her attacker was extremely forceful and merciless with her.

5) The Defendant took the shoe lace out of one of the victim's tennis shoes and the straps from her overalls, and after he raped her, he tied the shoelace and the straps around her neck and strangled her to death. The Defendant left the victim in the woods at Atterbury and walked to meet his wife, Melissa Overstreet, who picked him up pursuant to his direction, hours after his brother dropped him off.

6) The Defendant had been drinking on the evening of September 26, 1997 and the early morning hours of September 27, 1997.

7) The Defendant left his home again in the early morning hours of September 27, 1997. After his return home he slept until almost 3:00 p.m. that day.

8) The Defendant returned to Atterbury on the morning of September 27, 1997, he picked up the victim by her legs as she was lying face down in the area of the woods where he had raped and killed her, he dragged her body to his van, transported her to Brown County, Indiana, and threw her body out of his van into the ravine where it was found only days later.

9) A hand-drawn map of the area where the victim was dumped by the Defendant was found in his home. One of the victim's shoelaces, her shoes, and

her socks were found buried under human waste in a pit-toilet in the area where the crimes took place in Atterbury. <u>The Defendant spent hours vacuuming and cleaning the back of his van approximately two (2) days after Kelly Eckart was transported in his van to Atterbury and later to Brown County, Indiana.</u> All evidence of decisive steps taken by the Defendant to conceal the body and other evidence of the crime.

TR at 1290-92 (emphasis added).

Only one minor sentence of these nine paragraphs makes reference to the testimony of either Melissa Overstreet or Amanda Chittum. The balance of the recounted facts – descriptions of the planning, abduction, rape, murder, and attempt to hide the body and belongings of an unknown, innocent victim – convince me that a fuller impeachment of Melissa Overstreet and Amanda Chittum would have done nothing to change the result because their testimony had merely an "isolated, trivial effect" on the decision to impose the death penalty. *Strickland*, 466 U.S. at 696.

Overstreet makes much of the trial court's decision to use the term "lurid mind," but I do not read those words as having any special magic. TR at 1294 at ¶ 16. They are merely a succinct, disparaging description of Overstreet's abduction, rape, and murder of Kelly Eckart. Furthermore, the phrasing of the sentencing order shows that these two segments of testimony were only minor items of "further testimony" which were not central to the decision to impose the death penalty. Here's exactly what the sentencing judge said (in addition to the portion quoted above) in the sentencing order:

The Court finds that the aggravating factor found herein that the Defendant intentionally killed Kelly Eckart while committing rape should be given substantial weight and great consideration. All of the factors as cited herein in paragraphs 15(b)(1) through 15(b)(9) point to the unmistakable conclusion that the defendant planned to abduct an unwitting and unsuspecting person on the evening of September 26, 1997. The Defendant had a weapon and a plan he intended to follow through with. The Defendant acted on his sinister plan by

disabling his victim, raping her, killing her by strangling her with her own
clothing, and dumping her partially clothed body in an area he had mapped out in
advance to end his plan. The acts of the defendant were calculated, cold-blooded,
merciless, and sinister from beginning to end. <u>As further testimony</u> to the
Defendant's lurid mind, the Defendant destroyed evidence in his van, tried to hide
the victim's shoes and socks, involved and threatened his brother, and
approximately four (4) days after he threw the victim's body into a ravine, he
visited the site again for no apparent reason. The manner in which the crime was
committed, the motivation, the Defendant's actions to conceal the body and other
evidence of the crimes, as well as other attendant circumstances of the crime, are
the type of considerations which augment the value of this aggravator.

TR at 1294 at ¶ 16 (emphasis added).

If these two bits of testimony had been used to substantially augment the aggravator, they

would have been more highly ranked in the list of factors, or more clearly identified and

discussed, or both. The inclusion of them in a list of "further testimony" at the end of the

evaluation of the aggravating factor did not meaningfully add to the conclusion that the death

penalty should be imposed, nor would their omission have meaningfully detracted from it.

Overstreet argues that the trial court rejected his mitigating evidence concerning his

mental health because of the improperly impeached testimony of Melissa Overstreet and

Amanda Chittum. It did not. The court accepted all eight of Overstreet's mitigators and assigned

them weights it deemed to be appropriate.  Addressing Overstreet's mental health as a mitigating

factor, the trial judge stated:

[T]he defendant was able to plan for the defendant's [sic] abduction, conceal her
body, telephone his brother and ask for assistance, direct his brother to a specific
location where he wanted him to take the victim, tell his brother he took a girl and
threaten his brother into assisting him. He undressed the victim, he raped her, he
murdered her, he spoke to his wife after the crimes were committed, he returned
to the area to move the body to a more remote location, he hid the victim's shoes
and socks in another location, <u>he cleaned his van to destroy evidence</u>, he watched
news reports regarding the crimes, he prepared and maintained a map of where
the body was hidden, <u>and he visited the location where the body was hidden at a
later time</u>. Therefore, despite defendant's medical and mental condition, the

evidence is too extensive for the Court to give a great deal of weight to this mitigating factor. But I am giving it weight, I'm finding it to exist, and I'm giving it low to moderate weight as a mitigating factor.

TR at 5458-59 (emphasis added).

This passage shows that the value of the mental health evidence was discounted because Overstreet was functional despite his illness. He was able to plan the abduction and to execute that plan. He was able to organize his brother and his wife to assist him. He was able to dispose of the body and the clothing in separate locations. He mapped out where he had hidden the body, and he remained concerned about the progress of the investigation of the crimes. Even if the van cleaning story had been fully discounted as fantasy, even if there had been no evidence that Overstreet had been driving in the area where the victim's body was found on September 30, 1997, there is no reasonable probability that the result of either the penalty or sentencing phases of his trial would have been different.

Finally, citing *Canaan v. McBride*, 395 F.3d 376, 386 (7th Cir. 2005), Overstreet argues that "[e]ven if the odds that the defendant would have been acquitted had he received effective representation appear to be less than fifty percent, prejudice has been established so long as the chances of acquittal are better than negligible." ECF 38 at 58. Though phrased differently than the test in *Strickland*, *Canaan* did not create a new or different test for evaluating prejudice. Rather *Canaan* quoted *Strickland* for the proposition that "[a] 'reasonable probability' of a different result is one 'sufficient to undermine confidence in the outcome.' *Strickland*, 466 U.S. at 694." *Canaan* at 386. The *Canann* test is merely the *Strickland* test in different words. That is to say, if the likelihood of a different result were more than negligible, then confidence in the outcome would be undermined. But that is simply not the case here. Even if Amanda Chittum

and Melissa Overstreet had been more thoroughly impeached or had their eyewitness accounts more thoroughly challenged, I can state confidently that it would have made no difference in the result of either the trial or the sentencing.

B.

During trial, one of the State's witnesses made several passing references to the fact that the DNA evidence was submitted to a lab for testing by the defense. The context was in an effort to establish a chain of custody for the admission of the evidence. Overstreet claims that his lawyers were ineffective for failing to timely object to the reference and failing to ask for a curative instruction. ECF 16 at 33. The gist of Overstreet's complaint is that this reference to the defense testing of the DNA had the effect of impermissibly shifting the burden of proof to the defense.

The Indiana Supreme Court addressed this claim on the merits in its opinion denying post-conviction relief:

> The record shows that prior to trial the trial court ordered certain evidence held in the custody of the Indiana State Police laboratory released to a DNA laboratory designated by the defense team. At trial the State sought to introduce several items of evidence including blood and hair samples held in the State Police laboratory. In establishing a chain of custody, and in response to questioning by the State, the State's witness twice testified that the items had been sent off for some additional testing at the request of the defense attorney. Tr. at 4328, 4336. Later, the State inquired, "Sir, you've indicated that several of the items that we've talked about here and that we've admitted were sent to the Defense's laboratory for testing; correct?" *Id.* at 4368. Trial counsel objected and at a side bar noted that he had allowed the answers to those questions to show chain of custody, but argued "if he goes any farther with it, he's infringing on the Defendant's right not to present any evidence and shifting the burden, and we'll ask for [an] immediate mistrial if he goes one step farther with it." *Id.* The State then withdrew the question.
>
> Characterizing the two earlier responses as "evidentiary harpoons," Overstreet complains that counsel rendered ineffective assistance for failing to object in the first instance. Br. of Appellant at 52. First, an evidentiary harpoon

occurs when the prosecution places inadmissible evidence before the jury for the deliberate purpose of prejudicing the jury against the defendant and his defense. *Evans v. State*, 643 N.E.2d 877, 879 (Ind. 1994). Even assuming the challenged testimony was inadmissible, we are not persuaded it was introduced for the deliberate purpose of prejudicing the jury. Rather, it is apparent that the references were made in the context of the State establishing a chain of custody - a point on which the State bears a higher burden for "fungible" evidence, such as blood and hair samples. *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002). In short, absent a stipulation by the defense, the State had to account for the whereabouts of the evidence that was not in its possession and control for a period of time. Second, in order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show an objection would have been sustained if made. *Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001) (*citing Timberlake v. State*, 690 N.E.2d 243, 259 (Ind. 1997)). We agree that the responses at the "request of the defense attorney" were objectionable. An objection to this reference and a motion to strike likely would have been sustained. <u>But trial counsel cannot be faulted for his strategy of declining to object. There was no need to bring unnecessary attention to this matter arising as it did in the context of the State establishing a chain of custody.</u> In sum, Overstreet has not shown that counsel's conduct was objectively unreasonable.

*Overstreet II*, 877 N.E. 2d at 154-55 (brackets in original, emphasis added).

Overstreet argues that the Indiana Supreme Court's holding is an unreasonable application of *Strickland* because if counsel had objected, he could have gotten a curative instruction. According to Overstreet, had this occurred the "improper evidence would not have been highlighted or reinforced, but simply ignored." ECF 38 at 60. This argument creates a false dichotomy. A curative instruction inherently highlights and reinforces the improper evidence while simultaneously informing the jury to ignore it.

Though Overstreet is correct that there is a presumption that juries follow instructions of the trial court, curative instructions are not a perfect solution. Counsel must decide when or if to object. Then, if an objection is made, whether or not to request a curative instruction. The mere availability of a litigation technique does not necessitate its use; "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. As the Seventh

Circuit has held, the decision to request a limiting instruction is inherently a matter of trial strategy: "counsel's decision not to tender a limiting instruction was also a matter of trial strategy; counsel reasonably felt that...an instruction...might very well result in more harm...than benefit." *Drake v. Clark*, 14 F.3d 351, 357 (7th Cir. 1994).

Trial counsel's decision not to object at the first passing reference, but later to object when the reference was repeated, and his further decision not to ask for a curative instruction that would then have highlighted what had been mentioned inadvertently, were all plainly reasonable decisions of trial strategy. The Indiana Supreme Court decision in that regard, and its application of *Strickland,* were therefore not unreasonable.

## C.

Overstreet's brother – Scott Overstreet – was the target of a grand jury investigation for his role in the murder of Kelly Eckart. During the pretrial phase of his case, Overstreet sought access to the evidence and exhibits presented to the grand jury that was impaneled to investigate Scott's role in the murder. That motion was granted and Overstreet was given the requested material. In a subsequent motion, Overstreet sought not only the evidence presented to the grand jury, but also the comments made by the prosecutor when presenting the case to the grand jury. The judge who was supervising the grand jury reviewed the requested material – i.e. the comments of the prosecutor to the grand jury – *in camera* and denied the request. Trial counsel sought to appeal that ruling to the Indiana Court of Appeals but missed the filing deadline. The fourth deficiency alleged by Overstreet is that his trial counsel were ineffective by failing to properly perfect that appeal.

The Indiana Supreme Court adjudicated this claim on the merits and found that though trial counsel were deficient, Overstreet was not prejudiced by counsels' failure to file a timely appellate brief. The bottom line is that Scott Overstreet was effectively and thoroughly cross-examined on his role in the crime, and because of this, Overstreet cannot establish prejudice. As the Indiana Supreme Court noted:

> At trial the State elicited testimony from Scott that he was a target of the grand jury investigation. Trial counsel aggressively cross-examined Scott, challenging his credibility, discussing his conduct on the night of the murder, and exploring his testimony before the grand jury. During closing remarks trial counsel argued that Scott's testimony was not worthy of belief. Overstreet has made no showing that the post-conviction court's finding [that no prejudice was demonstrated] is clearly erroneous.

*Overstreet II*, 877 N.E. 2d at 152-53.

In evaluating this claim of ineffectiveness – the failure to appeal the pretrial ruling – it is important to begin by clarifying what this appeal was and was not. Despite the description of this appeal as "interlocutory" by Overstreet and the Indiana Supreme Court, it was not an interlocutory appeal. It also was not an appeal from the criminal case against Overstreet. Rather, it was an appeal from the final order in a separate proceeding. The death penalty case was tried in Johnson Superior Court before Judge Cynthia S. Emkes. The appeal in question was from the final order issued by Judge K. Mark Loyd – the judge who was supervising the grand jury – in the Johnson Circuit Court under a different cause number. That proceeding was initiated by Overstreet to obtain information which might be useful to impeach Scott. As such, it was a part of the pre-trial investigation process.

Overstreet argues that the Indiana Supreme Court's opinion that there was no prejudice is contrary to or an unreasonable application of *Penson v. Ohio*, 488 U.S. 75 (1988) and *Roe v.*

*Flores-Ortega*, 528 U.S. 470 (2000). Overstreet contends that because this is a case where a lawyer blew an appeal deadline, the prejudice prong under *Strickland* is presumed. In other words, there is *per se* prejudice. The problem is that both *Penson* and *Flores-Ortega* involved direct appeals from criminal convictions, whereas this case involves the appeal from a collateral pre-trial proceeding.

In *Penson*, prejudice was presumed because counsel had withdrawn and the defendant had no representation on direct appeal from his criminal conviction. *Penson*, 488 U.S. at 88-89. Unlike the defendant in *Penson*, Overstreet was not deprived of representation on the direct appeal of his criminal conviction. Rather, missing the appeal deadline in the derivative proceeding only deprived Overstreet of potential additional pre-trial information that could have been used to impeach Scott Overstreet. I say "potential" because even if his appeal had been properly filed and considered on the merits, there is no guarantee that Judge Loyd's ruling would have been overturned.

*Flores-Ortega* held that prejudice could be established by demonstrating that a criminal defendant who had pled guilty would have requested a direct appeal but for counsel's failure to adequately consult with the defendant about that option. It did not apply a *per se* prejudice rule. Instead, it contrasted the failure to consult about an appeal with cases where the *per se* prejudice rule was applicable. "In *Cronic*, *Penson*, and *Robbins*, we held that the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice because 'the adversary process itself' has been rendered 'presumptively unreliable.'" *Flores-Ortega*, 528 U.S. 470 at 483, *citing United States v. Cronic*, 466 U.S. 648, 659 (1984) (emphasis added).

In this case, there were two separate judicial proceedings. The appeal from the grand jury proceeding investigating Scott Overstreet was not a critical stage of Overstreet's criminal prosecution. Missing the appeal deadline in the grand jury proceeding did not render the adversary process in the criminal case presumptively unreliable. The consequences of missing the appeal deadline in the grand jury proceeding were no different than if counsel had decided not to appeal the ruling at all. No different than if he had not filed the motion seeking additional information. No different than if he had not initiated the secondary proceeding. No different than if he had failed to conduct any other pre-trial investigation. Indeed, it is not even different than if he had successfully obtained information for impeachment, but then not used it to impeach Scott Overstreet. None of those hypothetical deficiencies are critical stages of the criminal proceeding that render the adversarial process presumptively unreliable. Rather, they are merely routine claims for ineffective assistance of counsel which are properly subjected to the prejudice prong of *Strickland*.

To be sure, Overstreet's lawyers should not have missed the appeal deadline in Scott's grand jury proceeding. But doing so was not *per se* prejudicial to Overstreet's capital murder defense. Therefore, to obtain habeas corpus relief based on this claim, Overstreet has to demonstrate that the Indiana Supreme Court's prejudice analysis was unreasonable. The problem is that Overstreet has not even attempted to demonstrate prejudice, nor could he.

The fact that Scott Overstreet was subject to a grand jury investigation was made well known to the jury in his brother's trial. Scott was aggressively cross-examined and his credibility was effectively attacked. More generally, when one steps back and considers what Overstreet was asking for – the *prosecutor's* comments to the grand jury investigating Scott – one realizes

that it was a fool's errand in any event. It is difficult to conceive of any use Overstreet could have made of the prosecutor's comments at trial. As a result, there was no prejudice in failing to timely appeal the denial of that material. Overstreet has not demonstrated that the Indiana Supreme Court's resolution of this issue was unreasonable.

The only alternative argument that Overstreet has presented to the *per se* prejudice standard is a request for discovery to obtain the balance of the grand jury record. That is the issue I take up next.

### D.

Pending before me is Overstreet's First Motion for Discovery, "request[ing] an order from the Court that the Indiana Attorney General acquire, if not already in possession, the entire grand jury proceedings and provide those transcripts to Petitioner." ECF 39 at 15. As previously discussed in greater detail in Ground II, D., the Seventh Circuit has explained that before such discovery can occur, the procedural requirements of 28 U.S.C. § 2254(e)(2) must be met in cases where the "ultimate goal...is to introduce the transcript into the record and to have a federal court evaluate [the] ineffective assistance of counsel claims in light of the information in the transcript." *Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001). Overstreet acknowledges that is his goal when he argues that "[t]he content [of the grand jury transcript] either demonstrates ineffectiveness or it does not." ECF 39 at 15.

Here, I am denying the discovery motion because Overstreet did not attempt to obtain this material during the post-conviction proceeding, and so failed to develop the factual basis of the claim while in the state proceedings, as required by 28 U.S.C. § 2254(e)(2)(A)(ii). During oral argument on the discovery motion, Overstreet conceded that no effort was made during the

post-conviction proceeding to obtain the remainder of the grand jury materials. Because Overstreet did not exercise due diligence during the state court proceedings, he may not now conduct discovery.

The Indiana Supreme Court found that Overstreet "failed to establish he was prejudiced as a result of the failure [to file a timely appellate brief]." *Overstreet II*, 877 N.E. 2d at 152. Overstreet argues that it was impossible to conduct a prejudice analysis without first examining the undisclosed materials. But this argument ignores that Overstreet made no attempt to present the necessary factual basis for this claim during his post-conviction proceeding. It was Overstreet's obligation to at least try to have the post-conviction court review these materials. Had he tried to do so, but been denied the opportunity to have the additional grand jury material examined, then he would have demonstrated due diligence. But he did not. Overstreet cannot neglect to present the necessary evidence to the post-conviction court and then expect to expand the record and obtain a *de novo* review in this court contrary to the requiremens of 28 U.S.C. § 2254(e)(2). The Indiana Supreme Court – based on the evidence that was presented to it – found that Overstreet had not demonstrated prejudice. That was not an unreasonable application of *Strickland.*

* * *

The last claim raised by Overstreet relating to the ineffective assistance of counsel at the trial phase is that the cumulative effect of all of the errors discussed above prejudiced Overstreet. I find that the cumulative effect of any errors by trial counsel discussed above is not sufficient to undermine confidence in the outcome or to create a reasonable doubt respecting guilt. *Strickland*,

466 U.S. at 694. Therefore, Overstreet's claims based on ineffective assistance of counsel during the guilt phase of his trial must be denied.

## Ground V:  Marital Privilege

In his petition, Overstreet initially argued that his "rights to a fair trial were violated by the admission of evidence in violation of Petitioner's marital privilege." ECF 16 at 36. But in the traverse, Overstreet withdrew this claim. This claim having been withdrawn, it is unnecessary for me to address it.

## Ground VI: Ineffective Assistance – Verdict of Guilty But Mentally Ill

Overstreet's next claim is that his trial counsel were ineffective for failing to investigate and present readily available evidence to support a verdict of Guilty But Mentally Ill (GBMI). The thrust of Overstreet's argument is that the GBMI possibility was an attractive alternative in this case because the evidence of his guilt was strong, he had a history of mental illness, and because no one found GBMI has ever been executed under Indiana's modern death penalty statute. Overstreet argues that the Indiana Supreme Court's adjudication of this claim was unreasonable, but the argument is a non-starter because Overstreet did not assert an insanity defense which is a prerequisite to getting the GBMI option in the first place.

In 1981, Indiana law changed to allow the option of a verdict of GBMI when a defendant asserts an insanity defense. The cultural and political forces which motivated the enactment of this statute are exemplified by the case of Lyman Bostock. In 1979, Bostock was a rising star in Major League Baseball, as an outfielder for the California Angels. He was in Chicago facing the White Sox when he made an ill-advised trip to nearby Gary, Indiana to visit relatives. While in Gary he was seen riding in a car with a woman who was married to Leonard Smith. Smith saw

them riding in the car together, assumed they were having an affair, became enraged, pulled a gun and shot Bostock dead. Sadly, Smith was mistaken. Bostock had met the woman only 20 minutes earlier. Smith was later acquitted when a jury found him not guilty by reason of insanity. He was released from a psychiatric hospital 7 months later when a state psychiatrist deemed him sane. *See Lyman Bostock*, Wikipedia, [http://en.wikipedia.org/wiki/Lyman_Bostock](http://en.wikipedia.org/wiki/Lyman_Bostock) (last visited February 3, 2011). A public outcry ensued, and in its wake, the Indiana legislature enacted the Guilty But Mentally Ill statute to limit the ability of defendants to successfully plead insanity as a defense to avoid responsibility for their criminal acts. *See* Scott A. Kinsey, Comment, *Indiana's Guilty But Mentally Ill Statute: Blueprint to Beguile the Jury*, 57 Ind. L.J. 639, 640 (1981-82).

Here's what the statute says:

> In all cases in which the defense of insanity is interposed, the jury (or the court if tried by it) shall find whether the defendant is:
>   (1) Guilty;
>   (2) Not guilty;
>   (3) Not responsible by reason of insanity at the time of the crime; or
>   (4) Guilty but mentally ill at the time of the crime.

INDIANA CODE § 35-36-2-3.

A GBMI verdict is not a generally available alternative to a guilty verdict, but rather it is applicable only when "the defense of insanity is interposed . . .." *Id.* As the Indiana Supreme Court has explained, "When a defendant interposes a defense of insanity, a jury may return four possible verdicts: (1) guilty, (2) not guilty, (3) not responsible by reason of insanity at the time of the crime, or (4) guilty but mentally ill at the time of the crime. IND. CODE § 35-36-2-3 (1993)." *Hurst v. State*, 699 N.E.2d 651, 653 (Ind. 1998) (emphasis added).

Here, Overstreet concedes that "[i]nsanity was not a viable theory, as no expert was prepared to testify that Overstreet was unable to appreciate the wrongfulness of his actions." ECF 16 at 37. Prior to the death penalty being sought in the case, the first attorney appointed to represent Overstreet filed a Notice of Intent to Interpose Defense of Insanity (TR at 103), but after the team of death penalty attorneys were appointed (the attorneys who are now alleged to be ineffective), they withdrew it. TR at 977. Overstreet does not argue, and never has, that his trial attorneys were ineffective because they withdrew the insanity defense, nor that they were ineffective for not reinstating it.

Because Overstreet did not (and by his own admission – could not) assert an insanity defense, it was not possible for him to obtain a jury verdict of Guilty But Mentally Ill. Therefore, his trial counsel were not ineffective for not attempting to obtain such a verdict. During oral argument in this case, counsel for Mr. Overstreet was unable to identify any Indiana case law which would permit a Guilty But Mentally Ill jury verdict without an insanity defense having been asserted. Though counsel argued that a case before the Indiana Supreme Court might address this question, such a ruling would have no impact on the resolution of this case because "the Sixth Amendment does not require counsel to forecast changes or advances in the law." *Valenzuela v. United States*, 261 F.3d 694, 700 (7th Cir. 2001), *quoting Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993) and *citing United States v. Smith*, 241 F.3d 546, 548 (7th Cir. 2001) (noting that an ineffective assistance of counsel argument premised on counsel's failure to anticipate *Apprendi* would be untenable).

**Ground VII: Ineffective Assistance at the Penalty Phase**

Overstreet next argues that his lawyers were ineffective for failing to competently investigate and present readily available mitigating evidence at the penalty phase of trial. ECF 16 at 40. The thrust of his argument is that his lawyers were ineffective because they presented evidence that Overstreet was suffering from a schizotypal personality disorder when in fact he had schizophrenia, a much more severe mental disorder. Additionally, Overstreet argues that, while they did present some mitigation evidence, they did not present all that was readily available. According to Overstreet, to do so would have given the jury more reason to have mercy on him.

Despite being explained in the petition as a series of errors related to the accumulation, identification, and presentation of mitigation evidence, the essence of the claim here is that counsel should have presented more and better mitigation evidence. Therefore, even though the Indiana Supreme Court did not explicitly address all of the particular deficiencies identified in his habeas corpus petition, it nevertheless addressed the substance of this claim. Overstreet contends that the Indiana Supreme Court unreasonably applied both the deficient performance and the prejudice prongs of the *Strickland* test. Because I ultimately find that there was no prejudice, it is unnecessary for me to explore the deficient performance question. *See Strickland,* 466 U.S. at 697 (When "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.")

A.

Overstreet vehemently argues that he had schizophrenia – not simply schizotypal personality disorder – and that additional evidence of his schizophrenia should have been

presented at the sentencing hearing. In his traverse, Overstreet contends that Drs. Smith, Coons, Haskins and Price all agreed at the PCR hearing that Overstreet had been schizophrenic for years prior to the offense and was experiencing the debilitating psychotic symptoms of this disease at the time of the offense. ECF 38 at 83-84 (*citing* PC at 527, 447, 593, 610-13, 658-63).

This is a serious distortion of the PCR record. Only one of the four listed doctors could reasonably be described as having testified that Overstreet had been schizophrenic "for years prior to the offense." *Id.* Two made no specific mention of how long he had been schizophrenic and the last specifically said he did not know if Overstreet had been schizophrenic before 1996. Moreover, after an examination of the cited pages (and the pages immediately preceding and following those pages) I find that none of them testified that Overstreet "was experiencing the debilitating psychotic symptoms of this disease at the time of the offense." ECF 38 at 84.[4]

Related to this argument is Overstreet's contention that the jury (and judge) should have been told that at the time of the offense, Overstreet was being treated with Paxil which would

---

[4] Dr. Smith testified that he had no doubt that Overstreet was schizophrenic in 1997, but made no specific diagnosis for the preceding years. Dr. Smith also testified that alcohol, which Overstreet consumed on the night of the offense, "reduces inhibitions, causes mood swings, interferes with concentration, increases impulsivity, increases difficulties with decision making, [thereby] what you now have is a combined impairment that's significantly greater than either one alone." PC at 527. That is not an assertion that Overstreet was actually experiencing any psychotic symptoms at the time of the offense, much less debilitating ones.

Dr. Coons testified that Overstreet, "qualified for diagnosis for paranoid schizophrenia." PC at 447. He did not mention how long Overstreet had that disease, nor anything about what symptoms he might have experienced at the time of the offense.

Dr. Haskins testified that Overstreet was schizophrenic in 1997, but he also said, "Whether he was paranoid schizophrenic before 1996 I do not know." PC at 610. Dr. Haskins did not mention the severity or type of symptoms that may have been experienced at the time of the crime. PC at 610-13.

Dr. Price testified about Dr. Engum's reports and explained that schizophrenia is "a waxing and waning disorder regardless of what treatment you get." PC at 662. He made no mention of Overstreet's specific condition at the time of the offense. He also testified that, "I think that if any of those doctors were here today and looked at this pattern since then, would say, yeah, he was schizophrenic and now you look back on it, it's certainly evolving. It was evolving back then." PC at 651. Though that testimony was stricken, Dr. Price made other references to "the evolution of the disorder" (PC at 652) and "the evolution of schizophrenia" (PC at 655) from which it can reasonably be inferred that he believed that Overstreet had suffered from the schizophrenia for many years. *See also* PC at 657-58.

have aggravated the symptoms of his psychosis. *Id. citing* PC at 323, 328, 456. Overstreet also says that his lawyers should have presented evidence that he drank heavily as a form of self-medication and that the use of alcohol by a schizophrenic can greatly exacerbate the symptoms of that disease. *Id. citing* PC at 527-28. Finally, Overstreet claims that his lawyers should have called more family members as witnesses to confirm Overstreet's severe pathology and psychotic symptomology and his deteriorating mental condition.

The Indiana Supreme Court found that this additional evidence would not have made a difference in the outcome of the sentencing given the extensive evidence of Overstreet's severe mental illness that was presented at trial. Here's what the Indiana Supreme Court said:

> [T]he jury heard extensive testimony from Dr. Engum about the seriousness of Overstreet's mental illness. As recited above Dr. Engum testified, among other things, that Overstreet was severely mentally ill, that Overstreet's mental illness was an extreme mental or emotional disturbance, and that Overstreet's schizotypal personality disorder substantially impaired his ability to conform his conduct to the requirements of the law. At sentencing the trial court considered the reports of both Dr. Smith and Dr. Engum. We conclude not only has Overstreet failed to show that the conduct of counsel in entering into what may have been an inaccurate stipulation [that the opinions and diagnoses of Smith and Engum were "identical"] fell below an objective standard of reasonableness, but also he has failed to show any prejudice resulted from counsel's conduct.

*Overstreet II*, 877 N.E. 2d at 156 (footnote omitted). I cannot say that it was an unreasonable application of *Strickland* for all five justices of the Indiana Supreme Court to have concluded that Overstreet failed to establish prejudice.

The fact of the matter is, the sentencing court received an abundance of evidence concerning Overstreet's mental illness. Dr. Engum testified that Overstreet had a "[s]everely disturbed personality structure." TR at 5078. He then elaborated on what he meant:

> [Overstreet was] a seriously-disturbed individual with features of what we talk about as a schizotypal personality disorder. Showing somebody who was

depressed, socially inept, no real friends or confidants outside the family, somewhat excentric [sic], what I call magical thinking and beliefs, ideas of reference, where things happen in the environment and you think they have special meaning to you, some degree of paranoia which was also present in the record.

TR at 5079. Dr. Engum then explained that schizotypal is a "severe psychopathology," TR at 5080, and that schizotypal personality disorder "is among the most severe of the personality disorders." TR at 5122. Here's how Dr. Engum explained it:

To understand schizotypal personality disorder you have to understand that it is one of the most severe personality disorders, and if there is a dividing line between, shall I say psychosis and nonpsychosis, schizotypal is just on the nonpsychotic side. You're close, but you're not quite there.
    The problem with schizotypal in individuals is under stress, under pressure, under extreme circumstances they will what we call "decompensate," and you will actually see brief manifestations of psychotic schizophrenia where you start getting delusions, you start getting hallucinations, you start seeing [things] and becoming very disorganized.

TR at 5127. Dr. Engum's ultimate conclusion to the jury was that Overstreet was afflicted with a "severe mental illness." TR at 5135.

Overstreet adamantly objects to the Indiana Supreme Court's conclusion that the lack of additional evidence about his schizophrenia was not prejudicial. He contends that the Court erred in its failure to make a legal distinction between schizotypal personality disorder and schizophrenia. But while it is true that medically they are classified as different conditions, the question before the court was not a medical one, but a legal one. Medically, the origin and manifestation of a mental illness is critical to understanding and treating it, but the goal of the sentencing hearing was obviously not the treatment of Overstreet's mental illness. Rather, the task facing the factfinder at sentencing was to assess mitigation values and then to weigh them against the aggravating factors.

Under Indiana sentencing law then in effect, there were two mitigating factors to which the issue of Overstreet's mental illness was germane. First, under Indiana Code §35-50-2-9(c)(2), one mitigating circumstance to be considered is whether "[t]he defendant was under the influence of extreme mental or emotional disturbance when the murder was committed." Second, under INDIANA CODE § 35-50-2-9(c)(2) the court was to consider whether the "defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication."

During the sentencing hearing, testimony was given concerning the distinction between medical and legal determinations. Dr. Engum testified that Overstreet suffered from an extreme mental or emotional disturbance as defined by Indiana law. He then testified that under a legal standard, there was no question that Overstreet was unable to conform his conduct with the requirements of the law as defined by Indiana law.

> Q   Okay. In your opinion, your professional opinion, does Mr. Overstreet's mental illness qualify as extreme mental or emotional disturbance in the legal sense?
> A   Yes. Because that is a different standard than what we use psychologically and psychiatrically.
> Q   Is or was, in your opinion, it or was his ability to conform his conduct to the requirements of law substantially impaired as a result of his mental disorder or his defect that you testified about in a legal sense?
> A   This personality disorder?
> Q   Yes.
> A   Yes, absolutely, no question about that.
> Q   Okay. And his ability to conform his conduct would be limited and restricted?
> A   Yes.
> Q   In a legal sense?
> A   In a legal sense.

TR at 5136.

53

I cannot say that it was an unreasonable determination of the facts for the Indiana Supreme Court to have found that the two mental illnesses – schizophrenia versus schizotypal personality disorder – are insignificantly different in their mitigation value. It is uncontroverted that the testimony presented by Overstreet's counsel at the sentencing hearing met the legal standards for the two mitigators pursuant to Indiana Code 35-50-2-9(c)(2) and (6). That conclusion was accepted by the sentencing judge; she found that Overstreet was "under the influence of extreme mental or emotional disturbance at the time the murder herein was committed." I.C. 35-50-2-9(c)(2). The Court then placed moderate weight on this mitigating factor. TR at 1301-02. The Court likewise considered whether Overstreet was capable of appreciating the criminality of his conduct or able to conform his conduct to the requirements of law because he was substantially impaired as a result of mental disease, defect or intoxication pursuant to Indiana Code §35-50-2-9(c)(6). The Court found that he was but placed only low to moderate weight on this mitigating factor. TR at 1302-03.

So the sentencing judge found that Overstreet had a severe mental condition and that he was substantially impaired by that disease at the time he committed the offense. She then weighed those mitigating factors. I find it hard to believe that the sentencing judge would have placed greater weight on those factors had she been told that Overstreet had schizophrenia, as opposed to the severe mental illness that she was told that he did have. In order to find that the Indiana Supreme Court unreasonably applied the prejudice prong of *Strickland,* I would have to find that their decision was "objectively unreasonable" and that it was "well outside the boundaries of permissible differences of opinion." *Burgess v. Waters*, 467 F.3d 676, 681 (7th Cir. 2006) (internal quotes omitted). I cannot say that the decision of all five justices of the

Indiana Supreme Court – that had evidence of Overstreet's schizophrenia been presented, it would not have made a difference – meets this hefty standard.

B.

Overstreet next argues that his lawyers should have presented more evidence concerning his childhood which would have shown that it was characterized by extreme poverty, domestic violence, alcoholism, lack of nurturing and chaos. ECF 38 at 84, *citing* PC at 337-375. Based upon my *de novo* review of the additional mitigation evidence related to his family history, I find that Overstreet was not prejudiced by the absence of any of the additional mitigation evidence. *See Berghuis v. Thompkins*, 560 U.S. __, __, 130 S.Ct. 2250, 2265, 176 L. Ed. 2d 1098, 1105 (2010). Almost all of the additional evidence was cumulative of testimony that was presented at the sentencing hearing.

At sentencing, a great deal of evidence was presented concerning Overstreet's upbringing and his family history. The picture that emerged was of a dysfunctional household and a deeply troubled boy. Overstreet's mother testified that "his dad drank a lot." TR at 4993. And that "[h]e was abusive" and flat out "mean." TR at 4994. Overstreet's mother described an incident in which Overstreet's dad threw him into his baby bed when he was two years old. *Id.* Overstreet did nothing to deserve such treatment. *Id.* There was evidence that Overstreet's father routinely beat his mother. TR at 5005. He also regularly hit Overstreet and his siblings. TR at 5006. Overstreet got the brunt of the beatings because he would come to his siblings' defense. *Id.*

According to his mother, when Overstreet was in first grade, he saw the devil which led to him having severe headaches. TR at 4998. In the second grade Overstreet saw demons, and had "shadows and things following him." TR at 4999. His sister testified that Overstreet claimed

to have shadows following him and he even drew pictures of them. TR at 5048. But instead of mental health treatment, his mother opted to take "him to church, read the Bible, and taught him to pray . . . [t]hat the demons would go away." TR at 5002. She hung Jesus pictures around his room and constantly read the Bible to him. TR at 5050.

The jury further heard that Overstreet had difficulty sleeping because he felt that "something was trying to get him." TR at 5002. He talked about the demons constantly. TR at 5003. His mother testified that she took him for treatment "a couple times but I took him out . . . [b]ecause I told them I thought it was the devil and they looked at me like they didn't believe that. So I took him out, and I did the prayer and the Bible, the pictures." TR at 5003.

She testified that when he was ten he was "[s]itting down the street on somebody's driveway with his skateboard [at 4 a.m., but he] didn't even remember how he got there." TR at 5019-20. Similar odd events – Overstreet being found in places and having no idea how he got there – occurred "a lot of the time." TR at 5020. She testified that at fifteen, the demons and shadows that followed Overstreet were worse. TR at 5005. Sometimes he would leave school and come home but wouldn't remember how he got there. TR at 5021. He would then run to his bedroom and pray. *Id.* Throughout high school, from which he did not graduate, Overstreet continued to see demons and have painful headaches. TR at 5007. After dropping out, he enlisted in the Navy, but did not complete basic training. According to his mother, Overstreet was discharged because of "his mental problem." TR at 5010. Though he sought treatment again, his mother, "took him out against the doctor's wishes again." TR at 5011.

So there is no question that the jury was presented with substantial mitigating evidence that Overstreet's father was abusive and that he was a very troubled boy. Overstreet contends

that his lawyers were ineffective because there was an abundance of additional mitigating evidence that was readily available but not presented. But this is a difficult argument in light of cases like *Woods v. McBride*, 430 F.3d 813 (7th Cir. 2005), where the Seventh Circuit has routinely shot down claims of ineffectiveness where the claim is that not enough mitigating evidence was presented at sentencing. *Id.* at 826.

At the PCR hearing, Overstreet presented the following mitigation evidence that he claims should have been presented at trial and would have made a difference in the outcome: Overstreet's brother testified that Overstreet had "nose bleeds and migraine headaches." PC at 189. He testified that "he was just real edgy, you know, he, he could get angry real quick for no reason." PC at 190. He testified that their father was, "an alcoholic, abusive . . . if we done something wrong we was told to go to bed and didn't, we would, you know, get our punishment, you know it wasn't a beating, but you know, we'd, we'd, we'd be corrected." PC at 191. Unfortunately, all of this testimony is redundant of the evidence that was presented at sentencing. I can find no basis for believing that calling his brother as a mitigation witness could have benefitted Overstreet during his sentencing hearing.

Dwight Schneck, Overstreet's best friend in elementary school, testified at the PCR hearing that, "In grade school Dean was kind of shy or timid, always off to the side. He never was willing to give out information or was never very out, he was never out spoken or anything like that." PC at 223. Schneck said that he "would go to Dean's house and play outside mostly in his backyard or there was a creek that ran through town, we would play around the creek or in the city park. His mom, I never, I never really met his, I mean we met his parents, but his mom and dad, his dad was never there . . .." PC at 224. In junior high, they were placed in different

classes and Overstreet was in a lower ability group. He testified that Overstreet's house was "not one of the nicer homes, but it was, it was one, probably the lower end homes in that, in that area." PC at 224.

Linda Polesel, one of Overstreet's fifth grade teachers, also testified at the PCR hearing that Overstreet was not a trouble maker, but that "he tended to be withdrawn and he would look down a lot, . . . and [would] mumble . . . things." PC at 236-37. She testified that "he just seemed to be one of those, I mean he was always very quiet and just kind of kept to himself." *Id.*

Unfortunately, the rather opaque testimony from Schneck and Polesel is unlikely to have made any difference in Overstreet's sentence. Candidly, the additional evidence presented at the PCR hearing is hardly compelling. I can simply find no basis for believing that calling Linda Polesel or Dwight Schneck as mitigation witnesses would have benefitted Overstreet at sentencing.

Overstreet's father, Walter Earl Overstreet, testified at the PCR hearing that "I was a heavy drinker and I didn't stay home much." PC at 243. He testified that he "always had a job" but that he drank at night. *Id.* He testified that he would frequently wake up without knowing how he got there, and that there were times when he'd head to a bootleggers' house after the bars closed. PC at 246-48. He testified that he broke his wife's nose and that the police were called out to the house "pretty often . . . because of my drinking and, you know." PC at 249. He testified that he whipped his children and that Overstreet, as the oldest, was also punished for not preventing the younger children from getting into trouble. PC at 250-51. He testified that he did not tell Overstreet that he loved him very often. PC at 253. He testified that Overstreet had severe headaches and walked in his sleep. PC at 254-55.

58

It is certainly true that this testimony would have further developed the sentencing court's understanding of Overstreet's childhood and the household in which he was raised, but "[t]o establish prejudice, [the Petitioner] must show . . . that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wong v. Belmontes*, 558 U.S. ___, ___, 130 S. Ct. 383, 386 (2009) (quotation marks, ellipsis and citation omitted). Because this testimony is not substantially different from what was already presented during the sentencing hearing by Overstreet's mother and sister, I do not believe that there is a reasonable probability that the sentence would have been different if Walter Earl Overstreet had presented this testimony during the sentencing hearing.

As noted above, Shannon Richardson, Overstreet's sister, testified at the sentencing hearing. At the PCR hearing, she amplified on what she testified to at trial. She said that growing up, the house "was dirty and not much food . . . [d]irty clothes everywhere." PC at 337. "It was just constant arguing and fighting and there, it was just always chaos. I mean over everything, it was always turmoil." PC at 338. She testified that their parents fought constantly for no reason, that it was physical, that their father choked their mother and that she hit him with an iron skillet. PC at 340-42. She testified that during these fights Overstreet, "he'd just be blank. You known, cause all the other kids were nervous like me and then you'd look over at Dean and he's just had a blank look . . . just like he couldn't hear or see anything, there was nothing going on, he just stared." PC at 343-44. She testified that Overstreet fought with his brothers, but did not always remember doing so. PC at 345-46. She also testified that Overstreet watched out for her and kept her safe when she was little. PC at 371-72. She testified that their mother would tell Overstreet,

"'Well that's evil, that's probably the devil, you have the devil following you, the devil is going to get in you if you don't fight it.' And to hear that as a small child constantly, I mean I remember that constantly." PC at 379.

Like the testimony of his father, this additional testimony by his sister would surely have further developed the sentencing court's understanding of Overstreet's childhood. Nevertheless, it is simply not significantly different enough from the testimony that was presented at sentencing by Overstreet's mother to conclude that Overstreet was prejudiced by its absence.

In *Woods,* the evidence that counsel chose not to present at trial was much more compelling than the omitted evidence here. And yet the Seventh Circuit found there that the petitioner failed to establish prejudice. *See e.g. Woods v. McBride*, 430 F.3d 813, 825-26 (7th Cir. 2005). It is difficult to discern how Overstreet could establish prejudice under these circumstances in light of cases like *Woods*.

Finally, Emily Haile, a social worker, testified at the PCR hearing that she had reviewed information about Overstreet's history and testified that it was not good for a child to be raised in a home with alcoholic, abusive parents who have a genetic history of mental illness. PC at 408-28. This is hardly remarkable, and nothing presented to the sentencing court contradicted it. There is no reason to believe that the sentencing court would have reached a different conclusion had it heard from Haile at trial. She did not have any personal knowledge of the childhood home. Rather her information was based solely on what others told her. Again, I simply do not believe that this additional testimony could have been of any significant value in bolstering the mitigation case presented at the sentencing hearing.

In sum, based on my *de novo* review of all of the mitigation evidence – that which was heard by the sentencing court and that which was presented during the post-conviction hearing – I cannot conclude that the case for mitigation would have been meaningfully enhanced had all of the evidence been presented at sentencing. As the Indiana Supreme Court noted, the trial court specifically found that Overstreet "without a doubt . . . had a dysfunctional family and he does come from a broken home." TR at 5460. Though the factfinders at Overstreet's sentencing would have had a slightly fuller picture of his history if all of the evidence had been presented, there is no reasonable probability that Overstreet would have received a sentence other than death. Therefore this ground presents no basis for habeas corpus relief.

### Ground VIII:  Duplicate Aggravating Factors

In charging Overstreet with the death penalty, the State alleged three aggravating circumstances: (1) that Overstreet intentionally killed Eckart during the commission of another felony, in this case rape; *see* Ind. Code § 35-50-2-9(b)(1)(F) (1996 Supp.); (2) that Eckart was the victim of a sex crime for which Overstreet was convicted; *see* Ind. Code § 35-50-2-9(b)(13)(C) (1996 Supp.); and (3) that Eckart was the victim of criminal confinement for which Overstreet was convicted; *see* Ind. Code § 35-50-2-9(b)(13)(C) (1996 Supp.) The jury recommended the death sentence and the trial court later found that all of the charged aggravators had been proven beyond a reasonable doubt. *Overstreet I*, 783 N.E.2d at 1149-50. But when the trial judge rendered sentence, she only gave weight to the first aggravating circumstance. *Id*.

Overstreet now argues that his "rights under the Sixth, Eighth and Fourteenth Amendment were violated by the jury's consideration of duplicative aggravated circumstances at

the penalty phase to support their death recommendation." ECF 16 at 48. Overstreet argues that the first two aggravating circumstances "were based on identical facts." *Id.*[5] The Indiana Supreme Court disagreed, and therefore, Overstreet can only obtain habeas corpus relief if he can demonstrate that the Indiana Supreme Court's determination was unreasonable. *See* 28 U.S.C. § 2254(d).

The Indiana Supreme Court reasonably addressed this ground on direct appeal by finding that the two aggravators dealing with the rape of the victim were not identical. Here's what they said:

> Defendant's second challenge to the validity of his sentence focuses on what he terms the "duplicative aggravating circumstances" that the State alleged in support of its death penalty request. We set forth these aggravators under Background: (1) intentional killing during the commission of a rape and (2) the victim was the victim of a sex crime, here rape. His argument is predicated on the contention that the underlying felony of rape is impermissibly present in both aggravators. This, he contends, violates his constitutional guarantees against cruel and unusual punishment under the federal and state constitutions and double jeopardy under the state constitution.
>
> When aggravating circumstances share an element, we look to the policy or policies supporting each aggravator. *See Stevens v. State*, 691 N.E.2d 412, 434 (Ind. 1997), *cert. denied*, 525 U.S. 1021, 142 L. Ed. 2d 457, 119 S. Ct. 550 (1998). When the policy behind each aggravator is different, they are not impermissibly duplicative. *See id.* (upholding use of two aggravators with overlapping elements when the policy behind one aggravator goes to the defendant's character and the other goes to the status of the victim). Furthermore, the fact that our death penalty statute involves the weighing, rather than the counting, of aggravating factors mitigates against the concern that overlapping elements in distinct aggravators will get too much consideration. *See id.*
>
> In the present, [sic] matter, the felony-murder aggravator addresses Defendant's character. *See id.* (finding that the felony-murder aggravator focuses on the defendant's character, finding highly culpable "the fact that the mind of the accused has in the same criminal episode formulated and held the intent to kill and the intent to commit one of the enumerated felonies"). The victim of a sex crime aggravator spotlights the policy of adjusting punishment in accord with the

---

[5] Overstreet makes no objection to the use of the third aggravator – the one concerning his conviction for criminal confinement – so I will limit my discussion to the other two aggravators.

nature and degree of suffering experienced by the victim. The different policy considerations make the aggravators distinct. The trial court informed the jury that the penalty phase involved weighing, not counting, aggravating factors. And in determining the proper sentence to apply, the judge applied no weight to the victim-of-rape aggravator. In so doing, the judge accommodated Defendant's claim.

The trial court did not commit error by allowing the jury to consider both aggravating circumstances in this case.

*Overstreet I*, 783 N.E. 2d at 1161-62 (footnote omitted).

The Indiana Supreme Court reasonably explained why the two aggravators at issue do not duplicate one another. Therefore, it was unnecessary for the trial judge to have ignored one of them. But this of course could only have benefitted Overstreet. Only one charged aggravator went into the weighing calculus. Nevertheless, Overstreet argues that the jury should have received an instruction explaining the competing policy reasons for the two aggravators that seem similar, but are not. According to Overstreet, without the instruction, there was a risk that the weighing process would be skewed in favor of death. ECF 38 at 92.

There is a fundamental problem with Overstreet's argument: he has failed to identify any "clearly established Federal law, as determined by the Supreme Court of the United States" (28 U.S.C. § 2254(d)(1)) which requires a sentencing court to instruct jurors as to the policy justification for sentencing aggravators. In the absence of clearly established federal law requiring such an instruction, there can be no basis for federal habeas relief. *Van Patten,* 552 U.S. at 126.

Citing to *Stringer v. Black*, 503 U.S. 222, 230 (1992), Overstreet argues that "[t]he Supreme Court of the United States has noted that the Eighth Amendment does not permit a state appellate court in a weighing State to affirm a death sentence without a thorough analysis of the role an invalid aggravating factor played in the sentencing process." ECF 38 at 93-94 (quotation

marks omitted). But as discussed above (and in the Section X below) and as addressed by the Indiana Supreme Court, the jury did not apply an invalid aggravating factor or a duplicate one. Rather it merely allowed the jury to consider valid, distinct aggravators. Because there is no clearly established federal law which requires clarifying instructions about the policy justifications of valid aggravators, this ground presents no basis for habeas corpus relief.

### Ground IX: Ineffective Assistance - Weighing Aggravators and Mitigators

Overstreet next argues that his "Appellate counsel was ineffective for failing to raise a claim that Overstreet's death sentence was obtained in violation of his right to due process of law because the jury was not instructed that it had to find that the aggravating circumstances outweighed the mitigating circumstance beyond a reasonable doubt." ECF 16 at 49. Overstreet argues that Ind. Code § 35-50-2-9(k)[6] – the statute in effect at the time Overstreet was charged and tried – made weighing the aggravating and mitigating circumstances an element of a death sentence. According to Overstreet, it follows that the failure of the jury to unanimously find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt violated the standards set out in *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). ECF 16 at 50.

The Indiana Supreme Court did not address this ineffective assistance of counsel claim even though it was presented during the appeal from the denial of post-conviction relief. ECF

---

[6] Though this section was subsequently amended, at the time that Overstreet was charged and tried, it read:
(k) Before a sentence may be imposed under this section, the jury, in a proceeding under subsection (e), or the court, in a proceeding under subsection (g), must find that:
(1) the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances listed in subsection (b) exists; and
(2) any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.
INDIANA CODE § 35-50-2-9(k) (1997).

25-15 at 31-32. However, the PCR court did address the issue albeit not from the perspective of the ineffective assistance of appellate counsel. Rather it reviewed this question directly on the merits without consideration of the *Strickland* test. Because the PCR court was correct that weighing aggravators and mitigators is not a fact to be determined beyond a reasonable doubt, the principles of *Jones, Apprendi* and *Ring* were not violated. ECF 25-16 at 16-17. So appellate counsel could not have been deficient for failing to raise such an argument on appeal.

 *Jones* and *Apprendi* do stand for the proposition that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n.6 (1999); *Apprendi*, 530 U.S. at 476 (quoting *Jones*). *Jones* applied this proposition to federal prosecutions and *Apprendi* then applied it to the states when it held that "[t]he Fourteenth Amendment commands the same answer in this case involving a state statute." *Id.* *Ring* explained that "[c]apital defendants, no less than noncapital defendants . . . are entitled to a jury determination of <u>any fact</u> on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589 (emphasis added).

 Overstreet's claim here founders because the weighing process is not itself a "fact" which can be made subject to a reasonable doubt standard. The jury's weighing of the aggravating and mitigating factors "is not a finding of fact subject to *Apprendi* but a 'highly subjective largely moral judgment regarding the punishment that a particular person deserves." *Matthews v. Workman*, 577 F.3d 1175, 1195 (10ᵗʰ Cir. 2009), quoting *United States v. Barrett*, 496 F.3d 1079, 1107 (10ᵗʰ Cir. 2007). "[T]he requisite weighing constitutes a process, not a fact to be found."

*United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007). "[I]t makes no sense to speak of the weighing process...as an elemental fact for which a grand jury must find probable cause." *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005). Rather it is "the lens through which the jury must focus the facts that it has found to produce an individualized determination" as to the appropriate punishment. *Id. See also United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007). Thus, the jury was properly instructed that "The determination of the weight to be accorded the aggravating and mitigating circumstances is not a fact which must be proved beyond a reasonable doubt but is a balancing process for the jury." TR at 1251.

In sum, nothing in *Jones*, *Apprendi*, or *Ring* supports the proposition that the process of weighing aggravators and mitigators is a fact that must be determined by a jury beyond a reasonable doubt. Rather, weighing is a process of comparing aggravators to mitigators. Therefore Overstreet's appellate counsel was not deficient for omitting this argument during his direct appeal.

## Ground X: Ineffective Assistance – Consideration of Invalid Aggravators

Overstreet next argues that his appellate counsel was ineffective for not raising a claim based on *Espinosa v. Florida*, 505 U.S. 1079 (1992). ECF 16 at 51. In *Espinosa*, the Supreme Court explained that, "in a State where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment." *Espinosa*, 505 U.S. at 1081. Overstreet argues that his jury considered an invalid aggravating circumstance because two of his aggravators were duplicates of one another. This is a reprise of the argument discussed in Ground VIII.

As explained above, the aggravators dealing with the fact that Overstreet's victim was raped are not duplicates of one another. The first aggravator is in the nature of a felony-murder aggravator which places the focus on the defendant's character. By contrast, the other aggravator reflects the fact that Overstreet committed the murder while raping his victim. The focus here is on the impact that the crime had on the victim and spotlights the policy of adjusting punishment in accordance with the degree of suffering of the victim. Because there are separate policies behind each of these aggravators, consideration of both is not "invalid" under *Espinosa*. Therefore, Overstreet's jury did not consider an "invalid" aggravator nor did the trial court consider a skewed recommendation. It is true that the trial judge ended up discounting one of the aggravators because of her mistaken concern that they overlapped with one another. But as I stated earlier, ignoring one of the aggravators only could have inured to Overstreet's benefit. Therefore, there was no ineffective assistance of counsel and this ground presents no basis for habeas corpus relief.

## Ground XI - Severe Mental Illness

Overstreet argues that "[b]ecause he suffered from a severe mental illness at the time of the offense, Overstreet's death sentence is in violation of the Eighth Amendment and the Equal Protection Clause of the Fifth and Fourteenth Amendments." ECF 16 at 54. The parties debate about whether or how the Indiana Supreme Court addressed this issue. Because of the combination of four separate opinions discussing similar issues, admittedly, it gets a bit confusing. What is clear is that to the extent that the Indiana Supreme Court addressed this claim, it rejected it. Nevertheless, based upon my own *de novo* review, I find that this claim lacks merit. *See Berghuis v. Thompkins*, 560 U.S. __, __, 130 S.Ct. 2250, 2265, 176 L. Ed. 2d

1098, 1105 (2010) ("Courts can . . . deny writs of habeas corpus under §2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* §2254(a).").

In essence, Overstreet is asking me to extend the holding of *Atkins v. Virginia*, 536 U.S. 304 (2002), which banned the execution of the mentally retarded. ECF 38 at 102-03. The argument goes that because Overstreet suffered from a severe mental illness (schizophrenia), putting him to death is cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution of the United States. According to Overstreet, he is no more culpable or deterrable than mentally retarded offenders who are not eligible for execution. *Atkins*, 536 U.S. at 321.[7] All five members of the Indiana Supreme Court rejected this claim under the federal constitution. They held that although Overstreet has a long history of mental illness, there was no evidence presented at the PCR hearing on whether Overstreet's mental illness prevents him from comprehending the meaning and purpose of the punishment to which he has been sentenced. *Overstreet II,* 877 N.E. 2d at 173.

It is true that Justice Rucker agreed with Overstreet's position, but he based his agreement on an analysis of the Indiana Constitution. *Overstreet II*, 877 N.E. 2d at 174-75. Justice Rucker noted that the Indiana Constitution may confer rights that are greater than those which are conferred by the federal constitution, and he interprets the Indiana constitution to prohibit the execution of those with serious mental illness. It is Justice Rucker's view that the

---

[7] Petitioner expressly distinguishes his argument from a claim under *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007), which hold that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane. ECF 16 at 54 n.7; ECF 38 at 104.

underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill. *Overstreet II*, 877 N.E.2d at 175.

Overstreet essentially asks me to take the state constitutional analysis that Justice Rucker employed and apply its reasoning as federal constitutional law in this case. That analysis was not supported by any of the four other justices on the Indiana Supreme Court – all of whom disagreed with Justice Rucker's interpretation of the Indiana Constitution. Moreover, Overstreet has not identified any court which has adopted this position, and the Eleventh Circuit has expressly rejected it. *See Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1369 (11th Cir. 2009).

Even assuming that Overstreet suffers from a serious mental illness, I am not convinced that there is a legal basis for adopting what Overstreet himself acknowledges would be a "new rule." ECF 38 at 105. Despite Overstreet's arguments to the contrary (including those based on the Equal Protection Clause), *Atkins* does not prohibit the execution of those who were severely mentally ill at the time of the offense. Though the United States Supreme Court may one day extend the underlying principles of *Atkins* to such defendants, it has not yet done so. Therefore this ground presents no basis for habeas corpus relief.

## CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." SECTION 2254 HABEAS RULE 11(a). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Overstreet must show that reasonable jurists could debate whether his petition should have been resolved differently. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part. We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack*, where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Id.* at 338 (quotation marks and citations omitted).

Here, Overstreet has raised eleven grounds in his habeas corpus petition. As explained below, I will grant a certificate of appealability as to Grounds I, II, IV, VII and XI; I will deny a certificate of appealability as to Grounds III, V, VI, XIII, IX and X.

Ground I – Because this claim contains several procedural hurdles, there are many steps that reasonable jurists could debate. Therefore a COA will issue as to this ground.

Ground II – Reasonable jurists could debate whether Indiana properly applied *Strickland* to this claim. Therefore a COA will issue as to this ground.

Ground III – It is not debatable that there is no Constitutional right to know in advance the content of the adverse testimony of government witnesses in a criminal trial as long as the testimony is not exculpatory or impeaching. Overstreet cannot demonstrate that it was a due process violation not to have disclosed the pre-trial statement of Melissa Overstreet. Thus, a COA will not issue as to this ground.

Ground IV – My resolution of these claims required weighing whether Overstreet was prejudiced by the omissions of his trial counsel. Even if no jurist would reach a different conclusion, because reasonable jurists could debate how to weigh the competing factors involved in this ground, a COA will issue as to these claims.

70

Ground V – Overstreet withdrew this ground in his traverse. Therefore a COA will not issue as to this ground.

Ground VI – It is not debatable that Overstreet did not and could not have presented an insanity defense. Since a Guilty But Mentally Ill jury verdict is only available when the insanity defense is interposed, trial counsel was not ineffective for failing to ask for that verdict. A COA will therefore not issue on this ground.

Ground VII – My resolution of these claims required weighing whether Overstreet was prejudiced by the omissions of his trial counsel. Even if no jurist would reach a different conclusion, because reasonable jurists could debate how to weigh the competing factors involved in this ground, a COA will issue as to these claims.

Ground VIII – It is not debatable that the two challenged aggravators are independently valid nor that the Indiana Supreme Court reasonably found that the legislature had differing policy considerations for them. Neither is it debatable that there is no clearly established federal law which requires clarifying instructions about the policy justifications of valid aggravators. Thus, a COA will not issue as to this ground.

Ground IX – It is not debatable that the weighing of mitigators and aggravators is not a fact subject to determination beyond a reasonable doubt. Thus, a COA will not issue as to this ground.

Ground X – For the same reasons explained for Ground VIII, *supra*, a COA will not issue as to this ground.

Ground XI – Because Overstreet is seeking to advance a new legal theory, a COA will issue as to this ground.

**CONCLUSION**

For the foregoing reasons, (1) the Motion for Discovery (ECF 39) is **DENIED**; (2) the

petition for a writ of habeas corpus (ECF 16) is **DENIED**; and (3) a certificate of appealability is

**GRANTED** as to Grounds I, II, IV, VII and XI, but **DENIED** as to Grounds III, V, VI, VIII, IX

and X.  The Clerk shall enter judgment accordingly.

      **SO ORDERED**.

      ENTERED: March 4, 2011.

/s/ Philip P. Simon
Philip Simon, Chief Judge
United States District Court
